Danielle L. Manning SBN 313272
E-mail: dmanning@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

James M. Wilson, Jr. (appearance *pro hac vice*)
Robert W. Killorin (appearance *pro hac vice*)
Email: jwilson@faruqilaw.com
Email: rkillorin@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

*Attorneys for Lead Plaintiff*
*The Tang Family Investor Group and*
*Lead Counsel for the putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: REVANCE THERAPEUTICS, INC. SECURITIES LITIGATION | Case No. 5:21-cv-09585-EJD<br><br>CLASS ACTION |
| This Document Relates To: | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 7

PARTIES ........ 7

SUBSTANTIVE ALLEGATIONS ........ 9

I. FACTUAL BACKGROUND ........ 9

A. Company Background & DAXI ........ 9

B. Revance's Biologics License Application and Manufacturing Capabilities ........ 10

C. The FDA Inspection Of Revance's Manufacturing Facility And The Resulting Form 483 ........ 17

1. The Pre-Approval Inspection ........ 17

2. The Form 483 ........ 19

II. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........ 26

A. Statements Made Before The Pre-Approval Inspection ........ 26

B. Defendants Conceal Receipt of the Form 483 ........ 48

C. Defendants Continue to Mislead The Market About The Likelihood of Approval ........ 56

III. THE FDA DENIES REVANCE'S BLA ........ 58

IV. ADDITIONAL SCIENTER ALLEGATIONS ........ 61

A. *Respondeat Superior* ........ 61

B. Defendants Had Access To And Possession Of Material Adverse Facts ........ 62

C. Core Operations ........ 66

D. Defendants' Financial Motive ........ 69

1. Equity Grants and Other Incentive Compensation ........ 69

a. Revance's Bonus and Equity Incentive Programs Caused the Individual Defendants To Be Aware of the Progress of the FDA Regulatory Process for DAXI ........ 72

b. Revance's Equity Incentive Grants Incentivized the Individual Defendants to Artificially Inflate the Company's Share Price ..... 73

2. Revance's Motive ........ 73

E. Defendant's Experience and Education ........ 77

F. SOX Certifications ........ 80

V. PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 81

VI. LOSS CAUSATION ........ 83

VII. NO STATUTORY SAFE HARBOR ........ 85

VIII. CONTROL PERSON LIABILITY ........ 86

COUNT I ........ 86

COUNT II ........ 89

PRAYER FOR RELIEF ........ 90

JURY TRIAL DEMAND ........ 91

## TABLE OF DEFINED TERMS

| Term | Definition |
|---|---|
| **BLA** | Biologics License Application |
| **CAPA** | Corrective Action and Preventative Action |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **cGMP** | Current Good Manufacturing Practices |
| **CMC** | Chemistry, Manufacturing, and Controls |
| **Company** | Revance Therapeutics, Inc. |
| **COO** | Chief Operating Officer |
| **CRL** | Complete Response Letter |
| **DAXI** | DaxibotulinumtoxinA |
| **DS** | Drug Substance |
| **EIR** | Establishment Inspection Report |
| **Exchange Act** | Securities and Exchange Act of 1934 |
| **FDA** | United States Food and Drug Administration |
| **Foley** | Mark J. Foley, Revance's Chief Executive Officer During The Class Period |
| **Joshi** | Abhay Joshi, Revance's Chief Operating Officer and President, R&D and Product Operations During The Class Period |
| **Lead Plaintiffs** | Chonghao Tang, Shengzhen Tang, Qiuyan Liu |
| **MCB** | Master Cell Bank |
| **PDUFA VI** | Prescription Drug User Fee Agreement |
| **PSA** | Performance Stock Award |
| **RSA** | Restricted Stock Award |

| | |
|---|---|
| **SEC** | United States Securities and Exchange Commission |
| **WCB** | Working Cell Bank |

The allegations in this Amended Class Action Complaint are based on the personal knowledge of Lead Plaintiffs Chonghao Tang, Shengzhen Tang, and Qiuyan Liu (the "Tang Family Investor Group" or "Plaintiffs") as to Plaintiffs' own acts and are based on information and belief as to all other matters alleged herein. Plaintiffs' information and belief is based upon the substantial investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including the following: (i) review and analysis of public filings referenced herein made by Revance Therapeutics, Inc. ("Revance" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of public statements made by Defendants in press releases and conference calls; (iii) review and analysis of analyst reports, news articles, and other publications referenced herein; (iv) review and analysis of filings made by Revance with the U.S. Food and Drug Administration ("FDA") and documents issued by the FDA regarding Revance referenced herein obtained through Freedom of Information Act requests; and (v) review and analysis of other documents referenced herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Revance securities between November 25, 2019 and October 15, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Revance is a biotechnology company that for years had been developing its lead product candidate called DaxibotulinumtoxinA for Injection ("DAXI") that combines a proprietary peptide with the botulinum toxin to treat frown lines, forehead lines and lateral canthal lines ("crows feet"), among other things. It was an injectable drug that would compete

with Botox and similar products to smooth wrinkles for cosmetic reasons. According to the Company's clinical trials, patients treated with DAXI showed no or only mild frown lines for up to 6 months, which was touted by Defendants as differentiating DAXI from other botulinum toxin products that were effective for 3-4 months.

3. The Company and analysts believed that once approved by the FDA, DAXI would have a significant impact on the neurotoxin market, which in 2019 was over $4 billion. Neuromodulator products remained largely unchanged since botulinum toxin Type A treatments were first introduced nearly 30 years ago and they continued to provide short-term treatment. Because DAXI is longer lasting, it was seen as filling a significant and unmet demand.

4. In order to transition from researching and developing DAXI to commercial production, Revance had to obtain approval from the FDA based on the FDA's review of Revance's Biologics License Application ("BLA") and an inspection of the Company's manufacturing facility. The goals of this inspection are: (1) to assess readiness for commercial manufacturing; (2) to ensure conformance with the submitted application; and (3) to ensure the integrity of data submitted in conjunction with the application.

5. After a prior delay in filing the BLA early in 2019, the Company publicly set a goal that it would file the BLA with the FDA by the end of November 2019.

6. The Class Period begins on November 25, 2019, when Revance announced that it had finally filed its BLA for DAXI to treat moderate to severe glabellar (frown) lines. Defendants represented to investors that the BLA marked the beginning of the Company's transition from a development company to a commercial organization that would produce and market DAXI. Revance announced potential product approval in the second half of 2020.

7. However, Defendants knew and/or recklessly disregarded significant issues with the BLA and the Company's manufacturing such that Revance knew it was not ready for the FDA's pre-approval inspection. These issues materially decreased the likelihood that the BLA would be approved by the FDA as submitted and therefore materially decreased the likelihood that DAXI would be commercialized in the timeframe Defendants led the market to believe.

Defendants knew that once the FDA conducted its on-site inspection, the 2020 goal would not be possible because the BLA as submitted was unlikely to be approved. For one thing, in violation of FDA regulations, Revance failed to disclose the existence of a third-party facility it used to run certain tests, and had not entered into a Quality Agreement with them. Defendants knew or should have known that the manufacturing process and quality controls proposed in the BLA for DAXI were deficient. Revance had not manufactured the active ingredient in DAXI at commercial scale since September 6, 2019, and when it attempted to do so in August 2020, it failed and then did not determine the root cause of the problem until approximately December 2020. It was not until May 2021 that Revance finally adopted a Corrective Action and Preventative Action ("CAPA") plan to implement the steps necessary to resolve the problem they had known about since August 2020.

8. Due to these significant deficiencies and omissions from the BLA, Defendants knew or recklessly disregarded that it was completely unrealistic to tell investors that the BLA filed in November 2019 should be approved in 2020 pursuant to the Prescription Drug User Fee Agreement ("PDUFA VI") timeline. They did so anyway.

9. For example, Defendants repeatedly touted that the BLA had been "accepted for review by the FDA" and would be likely be approved on or around November 25, 2020, the date by which the FDA would inform the Company of its decision on the BLA ("PDUFA date"). Based on this timeline, Defendants touted that the Company was "busy preparing for a potential commercial launch of our next-generation neuromodulator before year end[.]"

10. Even after the FDA's on-site inspection was delayed due to COVID-19 in November 2020, Defendants acted as if approval was imminent and reaffirmed to the market that ". . . we remain confident in the strength of our BLA submission . . . ," "we continue to anticipate an approval this year . . . ," and telling the market that the Company had engaged in mock inspections to prepare for the FDA inspection.

11. Foley also expressly downplayed the risk of potential problems that could cause a delay in launching commercial production of DAXI based on the FDA's inspection. When an

analyst asked in November 2020 if the FDA were to identify deficiencies during an inspection whether the Company could respond to them without causing a delay, Foley stated "…we're ready. We're ready for them whenever they show up." That statement was false. In reality, things had been unraveling at Revance.

12. Specifically, on August 21, 2020, the Company attempted to manufacture a drug substance (DAXI's active ingredient) lot from its Working Cell Bank ("WCB"). A WCB is used to provide cells for the manufacturing process. The attempt failed. At that point there could be no doubt that the Company was not ready for FDA inspection.

13. Suspecting a problem with the WCB, the Company tried a second time to produce a drug substance batch of DAXI on September 25, 2020. That attempt also failed. None of this critical information was disclosed to investors.

14. The Company had no choice but to launch an internal Quality Investigation, which would ultimately lead Revance to determine that it would need to manufacture and qualify a new Working Cell Bank, pursuant to CAPA under FDA regulations. This would require changing the manufacturing process from the process set forth in the BLA. At this point, the Company had been unable to produce a working commercial scale drug substance lot of DAXI since Sept. 6, 2019. The Company was not ready for the FDA inspection, and withheld this information from investors.

15. Due to COVID-19, the FDA delayed its pre-approval inspection of Revance's manufacturing facility, finally completing it on July 2, 2021. Not surprisingly, the Company did not pass inspection. The FDA inspectors issued a Form 483 reflecting five significant objectionable conditions, including the manufacturing deficiencies described above. The Form 483 also reflected quality control issues, including the omission of the unlicensed testing facility from the BLA and the failure to enter into a Quality Agreement with that facility. While Revance was able to address some of the relatively minor deficiencies the FDA identified, there was no way for Revance to resolve the fact that its Working Cell Bank was ineffective and a new one had not yet been qualified, as the Company's internal projected date for completion was

December 31, 2021. Additionally, there was no way for Revance to resolve the fact that it was now proposing to use a different process to manufacture DAXI than the process contained in the BLA. Revance resorted to challenging the FDA's latter finding, incorrectly claiming that it was using the "exact same process as proposed." After considering Revance's objections, the FDA rejected Revance's claims and recommended against approval of the BLA "for lack of readiness for commercial manufacturing." Somewhat prophetically, on June 8, 2021, two weeks before the fatal FDA Form 483 inspection report, an analyst had asked Foley at a conference how much ***visibility*** Foley would give between then and the approval decision. Foley responded that "***[o]bviously if there was something that was not favorable, we would certainly release that***." Defendants did not honor that commitment, but rather continued to mislead investors and attempt to cover up the truth about the FDA inspection.

16. Indeed, on August 5, 2021, ***after*** Revance secretly received its undisclosed failing grade from the FDA on July 2, 2021, one analyst noted during the first earnings call following the preliminary approval inspection, "you're expressing a high degree of confidence in the launch. And so I'm assuming that the FDA inspection is going swimmingly." Rather than correct the analyst, Foley stated, *inter alia*, "I think you're sensing consistency with our tone around the expected approval before year-end. We've taken advantage of this time to keep up sort of our readiness for the inspection and continue to advance our commercial preparation plans."

17. In fact, on September 9, 2021, rather than disclose the disastrous results of the FDA inspection, Foley stated during an earnings call that "***ours was a very typical inspection***," that they were waiting to hear the FDA's decision, and that Revance is continuing "to actively prepare for approval. We ***continue building inventory. We've got our launch strategy and everything in place. And so we're ready to flip the switch as soon as we receive notice from the agency. So nothing really incremental that we have from them in terms of timing***."

18. On October 12, 2021, Revance's lies were exposed when a portion of the FDA's negative inspection findings were made public because of a Freedom of Information Act

("FOIA") request. Because of that FOIA request, the FDA posted on its website the Form 483 issued to Revance on July 2, 2021, that notified Revance of the significant objectionable conditions that the FDA had observed during its inspection of the Company's Northern California DAXI manufacturing facility. These observations included, among other things, that "[t]he current manufacturing process is not the process proposed for licensure" and Revance's "Quality Unit lacks the responsibility and authority for control, review, and approval for outsourced activities[.]"

19. The market reacted negatively to this unexpected bad news and partial exposure of the truth, causing Revance's stock price to fall precipitously by $6.85 per share, or 25%, to close at $20.45 per share on October 12, 2021.

20. Defendants responded to the disclosure of the Form 483 by falsely claiming that they remained confident in the quality of Revance's BLA and continued to anticipate approval in 2021. Some analysts reached out to regulatory consultants regarding the FDA's observations potential impact on the BLA. For example, two regulatory consultants for Guggenheim Securities LLC reported that they were "surprised" that the changes in the manufacturing process had not been reported to the FDA.

21. Then, on October 15, 2021, Revance disclosed after market that it received a Complete Response Letter ("CRL") from the FDA, indicating that "the FDA has determined it is unable to approve the BLA in its present form, and indicated that there are deficiencies related to the FDA's onsite inspection at Revance's manufacturing facility."

22. On this news, Revance's stock price fell dramatically again, dropping $8.90 per share, or 39.19%, to close at $13.81 per share on October 18, 2021. Analysts viewed this news as unexpected given Defendants' numerous positive statements, including ones made after the Form 483's release. A Piper Sandler analyst stated in his report, "Only days after expressing a high degree of confidence in an FDA approval of daxibotulinumtoxinA (daxi') in the near-term, Revance received a complete response letter (CRL) from the agency. That is undoubtedly

frustrating, even maddening. ***Though we have questions regarding how this came to pass*** (*e.g.*, did management simply misread the agency?), that is for another time."

23. Despite the unwavering confidence Defendants expressed to investors that DAXI would be approved in 2021, it was not approved by the FDA until September 9, 2022, and only after huge stock price drops occurred as the true state of the Company's internal problems came to light.

24. As a result of Defendants' fraudulent acts, statements and omissions, which led to the price of Revance stock being grossly over inflated before precipitous declines in market value, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

27. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendants conduct business in this Judicial District and a significant portion of Defendants' actions took place within this Judicial District.

28. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

29. Lead Plaintiffs Chonghao Tang, Shengzhen Tang, and Qiuyan Liu, as set forth in their respective shareholder certifications and incorporated by reference herein (ECF No. 20-3), purchased Revance common stock and options at artificially inflated prices during the Class Period and have been damaged thereby.

30. Defendant Revance is a Delaware corporation with a manufacturing facility located at 7555 Gateway Blvd, Newark California 94560 and its principal executive offices located at 1222 Demonbreun Street, Suite 2000, Nashville, Tennessee, 37203. Prior to January 1, 2021, Revance's principal executive offices were located at 7555 Gateway Boulevard, Newark, California 94560. Revance's common stock trades in an efficient market on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "RVNC."

31. Defendant Mark J. Foley ("Foley") served as the Company's CEO and a Director at all relevant times.

32. Defendant Tobin C. Schilke ("Schilke") served as the Company's Chief Financial Officer ("CFO") and Principal Accounting Officer at all relevant times.

33. Defendant Abhay Joshi ("Joshi") served as the Company's Chief Operating Officer and President, R&D and Product Operations at all relevant times until March 31, 2022.

34. Defendants Foley, Schilke, and Joshi are sometimes referred to herein as the "Individual Defendants."

35. The Individual Defendants possessed the power and authority to control the contents of Revance's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Revance's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions within Revance, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

36. Revance and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

## I. FACTUAL BACKGROUND

### A. Company Background & DAXI

37. Revance, a biotechnology company, engages in the development, manufacture, and commercialization of neuromodulators for various aesthetic and therapeutic indications in the United States and internationally.

38. Neuromodulators come in a variety of forms, including medicines injected into the muscle to interrupt the signal between the nerve and the muscle, causing it to relax. *See* Liesa Goins, *Injectables: Are Fillers and Neuromodulators Right for You?* (June 5, 2019), WebMD, https://www.webmd.com/beauty/features/injectables-fillers-neuromodulators (last visited Nov. 4, 2022). They can be used for aesthetic purposes, such as addressing wrinkles that are caused by the flexing of muscles, or therapeutic purposes, such as addressing migraine headaches. *See id.*; Sashank Reddy, M.D., Ph.D., *Botulinum Toxin Injectables for Migraines*, Johns Hopkins, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/ botulinum-toxin-injectables-for migraines (last visited Nov. 4, 2022).

39. The Company's lead drug candidate, DAXI, is made from botulinum toxin, a protein and neuromodulator produced by the bacteria clostridium botulinum, as well as a proprietary stabilizing peptide. Revance, Annual Report (Form 10-K) 1, 8 (filed Feb. 26, 2020). It contains no human or animal-based components. *Id.*

40. Botulinum toxins interfere with neural transmission by blocking the release of acetylcholine, a principal neurotransmitter, causing muscle paralysis and therefore preventing the formation of glabellar lines or wrinkles caused by muscle movement. *See BOLUTLINUM TOXIN Abstract*, PK Nigam and Anjana Nigam (Mar. 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2856357/ (last visited Nov. 4, 2022).

41. A peptide is a short chain of two or more amino acids, which combine to form proteins within the body. *See* Skinbetter, *The Science Behind Peptide Technology in Skincare*

(Dec. 8, 2016), https://skinbetter.com/science-peptide-technology-skincare/ (last visited Nov. 4, 2021).

42. According to Revance, the combination of the neuromodulator (botulinum toxin) with its proprietary stabilizing peptide is what gives DAXI a longer-lasting effect than competitors such as Botox. *See* Revance, Company Conference Presentation, 4-6 (Nov. 13, 2019). In clinical trials, DAXI demonstrated a 24-28 week duration for mild glabellar lines. *See* Revance, Press Release, *Revance Submits Biologics License Application (BLA) to the FDA for DAXI to Treat Glabellar (Frown) Lines* (Nov. 25, 2019). Botox, by contrast, typically lasts 3-4 months (12-16 weeks). *See* Revance, Company Conference Presentation, 6 (Nov. 13, 2019) (S&P Global, Inc. transcript).

**B. Revance's Biologics License Application and Manufacturing Capabilities**

43. Defendants were under significant pressure to submit the Biologics License Application ("BLA") to the FDA for DAXI, as Individual Defendants and other representatives from the company told the market that the BLA would be filed during the first half of 2019. *See* Revance, Q4 2018 Earnings Call, 5 (Feb. 26, 2019) (S&P Global transcript) ("We are laser-focused on submitting our BLA package to FDA for DAXI in the treatment of glabellar lines in the first half of this year."); Revance, Q4 2018 Earnings Call, 13 (Feb. 26, 2019) (S&P Global transcript) ("So basically, it's a procedural thing for us, and we hope that we can wrap it up in the next few months."); Revance, Special Call, 5 (Mar. 13, 2019) (S&P Global transcript) ("We plan to submit our BLA for glabellar lines in the first half of 2019, with a launch in first half of 2020.").

44. On May 8, 2019, Revance announced a delay in submitting the BLA. *See* Revance, Q1 2019 Earnings Call, 5 (May 8, 2019) (S&P Global transcript) ("We now plan on submitting our BLA in the fall of 2019 and are tracking to receive potential approval and launch in 2020.").

45. Finally, on November 25, 2019, the first day of the Class Period, Revance announced that it submitted its Biologics License Application ("BLA") to the FDA for DAXI,

seeking approval for the treatment of glabellar (frown) lines. *See* Revance, Press Release, *Revance Submits Biologics License Application (BLA) to the FDA for DAXI to Treat Glabellar (Frown) Lines* (Nov. 25, 2019). The BLA's contents have never been made public or revealed to investors.

46. As one analyst put it, "[t]he Daxi BLA submission will be welcomed news for RVNC investors given a prior delay that pushed BLA filing out to Fall 2019 (from 1H19). Needham, *Daxi BLA Submission Starts Clock on Potential Approval/Launch in 2H20*, at 1 (Nov. 25, 2019). ("The Daxi BLA submission will be welcomed news for RVNC investors given a prior delay that pushed BLA filing out to Fall 2019 (from 1H19)."). *See also* William Blair, *BLA for DAXI for Treatment of Moderate to Severe Glabellar Lines Submitted Ahead of Transformational 2020*, at 1 (Nov. 25, 2019) ("The company previously announced a slight delay in the BLA filing (from the first half of 2019 to fall 2019) to develop a 100-unit vial in addition to the original 50-unit product prior to submission, which required additional time to complete the chemistry, manufacturing, and controls (CMC) package.").

47. A BLA "is a request for permission to introduce, or deliver for introduction, a biologic product into interstate commerce." FDA, *Biologics License Application (BLA) Process* (CBER), https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-processcber (last visited Nov. 4, 2022).

48. A "biologic product" is made from living sources, like bacteria. Benita Lee, MPH, *What Are Biologics?,* GoodRX Health (June 16, 2022), https://www.goodrx.com/healthcare-access/medication-education/biologics-biological-drugs-examples (last visited Nov. 4, 2022).

49. Biologics like DAXI are subject to the Current Good Manufacturing Practices, or cGMP, regulations, which are found in 21 C.F.R. §§ 210, 211, and the Biologics regulations, 21 C.F.R. §§ 600-680. Compliance Program Guidance Manual, Chapter – 45 Biological Drug Products, Inspection of Biological Drug Products (CBER) 7354.848 ("Chap. 45"), at 5, available at https://www.fda.gov/media/73834/download (last visited Nov. 4, 2022).

50. The requirements for a BLA are set forth in 21 C.F.R. § 601.2. *See* FDA, *Biologics License Application (BLA) Process* (CBER), https://www.fda.gov/vaccines-blood-biologics/development-approval-process-cber/biologics-license-applications-bla-processcber (last visited Nov. 4, 2022).

51. 21 C.F.R. § 601.2 requires that a BLA include, *inter alia*, "a full description of manufacturing methods; data establishing stability of the product through the dating period; sample(s) representative of the product for introduction or delivery for introduction into interstate commerce; summaries of results of tests performed on the lot(s) represented by the submitted sample(s); specimens of the labels, enclosures, and containers, . . . ; and the address of each location involved in the manufacture of the biological product shall be listed in the biologics license application." 21 C.F.R. §601.2(a). Information concerning manufacturing is set forth in the chemistry, manufacturing, and controls ("CMC") section of the BLA. *See* FDA, *Form 356h*, at ¶30, *available at* https://www.fda.gov/about-fda/reports-manuals-forms/forms (last visited Nov. 4, 2022).

52. As part of the BLA approval process, Revance was required to demonstrate that its manufacturing and quality assurance systems, or those of its third-party contract manufacturers and suppliers, complied with cGMPs. *See* Chap. 45 at 5; *see also* FDA, Contract Manufacturing Arrangements for Drugs: Quality Agreements, Guidance for Industry (Nov. 2016) ("Quality Agreement Guidance"), at 3, https://www.fda.gov/media/86193/download (last visited Nov. 4, 2022).

53. To determine whether an applicant's manufacturing facilities comply with cGMPs and other applicable regulations, the FDA typically conducts a pre-approval or pre-license inspection.[1] *See* Chap. 45 at 5.

54. Even before submitting its BLA, Revance touted the readiness of the Company's manufacturing facility to withstand the FDA's BLA pre-approval inspection. For example, on

---

[1] "Pre-approval" and "pre-license" inspection are used interchangeably herein.

December 4, 2018, Revance's co-founder Browne stated that "one of Revance's strongest and most durable assets is our state-of-the-art manufacturing facility to manufacture both drug substance and drug product in the United States in the San Francisco Bay Area. We have a sophisticated CMC and analytics capability, along with the capacity and capability to immediately ship at commercial scale upon approval . . . ." Revance, Special Call, 10-11 (Dec. 4, 2018) (S&P Global transcript).

55. During the Company's Q4 2018 earnings call conference on February 26, 2019, COO Joshi and Browne continued to tout the Company's manufacturing capabilities and readiness for a pre-approval inspection. In response to an analyst's question, Joshi stated, ". . . with regards to the FDA inspection, as you guys all know, that once we file the BLA, we will receive a PI, or post -- pre-approval inspection, and that can happen any time within 3 to 6 months of our BLA filing. So we anxiously wait for that. ***We are fully prepared to accept the FDA facility***." Revance, Special Call, 10 (Dec. 4, 2018) (S&P Global transcript). Browne stated, "If I could come back to the facility, we think this is an asset that has tremendous shareholder value. There probably won't be another commercial-scale botulinum facility ever built in the United States again. It's-- the barriers to entry are just so high. We go through annual select agent approval. ***And so to Abhay [Joshi]'s point, we feel very confident in pre-approval inspection***. Quality, analytics has really been at the forefront of our manufacturing operation. And I think when you look at the Mylan partnership and the Fosun partnership, what really resonated with them was the quality and our intense focus on drug substance and drug product at commercial scale. So we feel very confident with our capability, not only in those relationships but as we build our own commercial business."). *Id.*

56. Shortly before Revance submitted its BLA, Browne stated, in relevant part:

> [Analyst]: And with respect to the filing in the U.S., what are you finishing up before submitting the application? And what's your level of confidence of an approval on first cycle review?
>
> [Browne]: Our conviction is very high. We've been manufacturing both drug substance and drug product at commercial scale for nearly 10 years. And doing that in the United States under the U.S. Select Agent Review, that's a very

> rigorous review, that not only looks at the processes that used to manufacture drug substance and drug product, it goes beyond that to your standards, your employee safety. Doing that out of the San Francisco Bay Area was a strategic commitment that we wanted to understand our molecule, our formulation, our supply chain in a way that very few companies other than Allergan had been able to do. And we thought that we could satisfy that demand out of a U.S. operation. The thing that has tripped up many companies in the neurotoxins has been on the CMC, the Chemistry, Manufacturers and Controls (sic) [ Chemistry, Manufacturing, and Controls ]. It's something that under the leadership, it's been a focus. And for us, as we believe that we'll file our BLA here in the fall, which is defined between now and the Thanksgiving time period without some of the other issues that have been problematic for some of the other companies.
>
> And I think it's -- this intense focus not only in clinical development, but on your manufacturing quality systems that I think will become a strategic advantage for Revance over time.

Revance, Company Conference Presentation, 7 (Sept. 10, 2019) (S&P Global transcript).

57. On November 13, 2019, just two weeks before Revance submitted its BLA, Schilke stated during a Company Conference Presentation that "we make our drug substance and our drug product based in the San Francisco Bay Area. And we have the option to scale our drug product manufacturer with partnership agreements in the U.S. as well. So we're well set up to commercialize DAXI from a manufacturing perspective and have a very thoughtful supply chain." Revance, Company Conference Presentation, 5 (Nov. 13, 2019) (S&P Global transcript). During this call, Schilke also stated that Revance "undergo[es] rigorous annual inspections for our manufacturing plant, which gives us confidence that we'll be able to go through our prior approval inspections for our DAXI approval for the BLA. Given sort of the nature and the scrutiny that we have on making such a toxic molecule that the C[DC], we have very detailed inspections with them." *Id.* at 8

58. The "rigorous review" and "annual inspections" to which Browne and Schilke referred were the inspections required by the Federal Select Agent Program. Revance is a part of this program because it manufactures a product containing botulinum toxin—a "select agent." *See* Revance, Company Conference Presentation, 7 (Sept. 10, 2019) (S&P Global Transcript).

59. This Program "oversees the possession, use and transfer of biological select agents and toxins, which have the potential to pose a severe threat to public, animal, or plant health or to animal or plant products." Federal Select Agent Program, Centers for Disease

Control, https://www.selectagents.gov/ (last visited Nov. 4, 2022). Registered spaces where select agents are stored or used are required to be inspected on an annual basis. *See* 42 C.F.R. § 73.9(a)(6); *see also* Federal Select Agent Program Annual Inspection Guidance, Centers for Disease Control, https://www.selectagents.gov/compliance/guidance/annual-inspection/index.htm (last visited Nov. 4, 2022).

60. Revance's BLA was accepted by the FDA on February 5, 2020, with an initial Prescription Drug User Fee Act, or PDUFA, "target action date" of November 25, 2020. *See* Revance, Form 10-K at 7 (Feb. 25, 2021).

61. The PDUFA "target action date" is the date by which the applicant can expect the FDA to render its decision regarding whether to approve or deny its BLA. *See* 21 U.S.C. § 379 *et seq*. Based on the PDUFA timeline, Defendants touted that they anticipated potential product approval in the second half of 2020.

62. While waiting for the FDA to give it an inspection date, Revance continued to express confidence that DAXI would be approved by the November 25, 2020 PDUFA date. Analysts picked up on the Company's confidence about approval by year end. For example, on February 26, 2020, an analyst from H.C. Wainwright & Co, stated, "This should be an eventful for the year for the company with approval of Daxi expected on the November 25 PDUFA date." H.C. Wainwright Co., Revance Gets Ready for Lift off, at 1 (Feb. 26, 2020).

63. On March 26, 2020, Guggenheim stated:

> Given manufacturing and supply chain stability, DAXI remains on track to launch following an expected approval (PDUFA of November 25th, 2020), which remains status quo. RVNC has a 90,000 sq. ft. manufacturing facility in Newark, CA (where the company is headquartered) with end-to-end capabilities for the production of botulinum toxin type A (including bulk drug substance and injectable finished drug product, DAXI). RVNC remains confident that drug product supply will be ready for potential commercial launch, and management had shared earlier that their expectation is to start booking DAXI sales at the start of 2021.

Guggenheim, *RVNC (BUY) – COVID-19 Corporate Update; RHA Fillers Launch Pushed to 3Q20 & Key DAXI Therapeutic Catalysts Still 2H20*, at 1 (Mar. 26, 2020).

64. On July 10, 2020, H.C. Wainwright stated:

> We were joined by President and CEO Mark Foley and CFO Tobin Schilke who provided insight on what is shaping up to be a transformative year as the company transitions with the expected launches of the Teoxane filler line in 3Q and, most significantly, Daxi, which has a PDUFA date of November 25th and ***should launch by year-end***.

H.C. Wainwright, Key Takeaways From HCW @ Home With Revance; Reiterate Buy, at 1 (July 10, 2020).

65. On August 6, 2020, an analyst from Piper Sandler stated that it was "confident in a timely FDA approval for daxi'. Recall FDA action for daxi' in glabellar lines is expected by 11/25/20, with a full launch planned before year-end." Piper Sandler, *2Q Update: RHA Fillers Set To Launch Next Month, With Daxi' To Follow*, at 1 (Aug. 6, 2020).

66. On November 24, 2020, the FDA deferred its decision on Revance's BLA for DAXI, postponing the original PDUFA target action date of November 25, 2020. Revance, Press Release, *FDA Defers Approval of DaxibotulinumtoxinA for Injection in Glabellar Lines Due to COVID-19 Related Travel Restrictions Impacting Manufacturing Site Inspection* (Nov. 25, 2020). This was due to restrictions related to COVID-19, which prevented the FDA from conducting an inspection of Revance's manufacturing facility. *See id.* The FDA did not set a PDUFA date this time.

67. Revance assured the market that it was ready for the pre-approval inspection whenever the FDA was. *See, e.g.,* ¶¶135, 144 (Foley stating we "***remain ready to support FDAs pre-approval inspection as soon as possible")***.

68. Based on Defendants public statements, analysts continued to assume that the inspection would be uneventful and result in immediate approval of DAXI. *See, e.g.*, Barclays, *RHA Launch Trending Ahead of Consensus; PipelineIntact; Awaiting FDA Site Inspection*, at 1 (Jan. 7, 2021) ("Revance noted it is confident in its submission and continues to work proactively with the FDA on a pre-approval inspection as soon as possible in 2021. We currently assume an inspection will take place in 1Q21 with a late Q1/early Q2 launch, and revenues beginning Q2 onwards.); H.C. Wainwright & Co., *Teoxane Beats Expectation but Daxi Inspection not yet Scheduled*, at 1 (May 11, 2021) (Management "plans to issue a press release

when the inspection is scheduled while building inventory ahead of the launch. We have little doubt that the Daxi is going to be approved based on the strong clinical data[.]"); William Blair, *First-Quarter Earnings; Strong RHA Launch Continues as DAXI Inspection Expected in the Near Term, Maintain Outperform*, at 1 (May 11, 2021) ("Given the positive interactions in the past, the clean data to date that includes the largest neurotoxin data set produced pre-approval, and a state-of-the art manufacturing facility, we expect an approval of DAXI within a relatively short period following inspection.").

### C. The FDA Inspection Of Revance's Manufacturing Facility And The Resulting Form 483

#### 1. The Pre-Approval Inspection

69. On May 26, 2021, Revance announced that the FDA planned to initiate an inspection of Revance's manufacturing facility by the end of June 2021. Revance, Current Report (Form 8-K) (filed May 26, 2021).

70. Analysts reported their view that based on Company public statements, the Company would pass the inspection. *See, e.g.*, William Blair, *Highlights From William Blair's 41st Annual Growth Stock Conference*(June 2, 2021) ("Regardless of the timeline, management noted that the company is ready for a launch whenever an approval decision is issued. Indeed, the company was prepared to launch following its original PDUFA date in November 2020, and has therefore had an additional 6+ months to refine its messaging, marketing materials, and strategy ahead of launch."); H.C. Wainwright Co., *Daxi Enters the Homestretch: Preapproval Inspection to Occur by End of June*, at 1 (May 27, 2021) ("Given the amount of time that Revance has had to prepare, we're optimistic that the inspection should go well."); Barclays, *2021 DAXI approval looking more certain with FDA inspection date in June*, at 1 ("This had been an overhang on the stock since the FDA inspection/approval expected in Q4 2020 did not materialize and management had limited visibility on the inspection until now. We believe this provides incremental comfort around a likely 2021 approval and a launch soon thereafter.").

71. On June 8, 2021, the Company participated in the Goldman Sachs 42nd Annual Global Healthcare Conference, during which Foley once again expressed confidence in approval and promised to inform investors if "there was something that was not favorable" about the inspection:

> [Analyst]: Okay, okay, understood. And then -- so then would -- how much more visibility would you give us between now and then? Or is it pretty much just going to be, when you get the approval decision, that's kind of the next update we'll have in terms of the Street?
>
> [Foley]: ***That will be the next update. Obviously if there was something that was not favorable, we would certainly release that, but really the next update would be approval***. Again, we broke sort of our traditional protocol, which hopefully investors can appreciate, which is normally when you're in those, those are confidential discussions. There's a lot of back and forth, a lot of things. Typically we wouldn't make those comments. We obviously did before PDUFA date because, at that point in time, it was obvious they weren't going to show up in time for that to happen given everything going on with the pandemic. And we also thought it was important, given this uncertainty of, okay, there is no clear path forward, that we at least tell people, hey, this is what's happening. This is the last gating item. ***And so the next announcement would be approval.***

Revance, Company Conference Presentation, 10 (Jun. 8, 2021) (S&P Global Transcript).

72. The FDA conducted a pre-license inspection of Revance's manufacturing facility in Newark, CA on June 21-25 and 28-30, and again on July 1-2, 2021. Ex. A at 1.

73. The pre-license inspection had three primary objectives: (1) to assess readiness for commercial manufacturing; (2) to ensure conformance with the submitted application; (3) to ensure the integrity of data submitted in conjunction with the application. *See* Ex. B, Establishment Inspection Report ("EIR") at 1;[2] FDA Compliance Program 7346.832, Chap. 46—New Drug Evaluation ("Chap. 46"), at 13.

---

[2] The EIR was obtained by Lead Counsel through a Freedom of Information Act Request to the FDA. It is the FDA's final written report of an inspection. Because most of its pages are not numbered, PDF pagination is used when referring to the EIR.

**2. The Form 483**

74. As a result of the inspection, the FDA issued a Form 483 on July 2, 2021 to COO Joshi indicating the company did not pass the inspection. A copy of the Form 483 is attached hereto as Exhibit A.

75. A Form 483 is "intended for use in ***notifying the inspected establishment's <u>top management</u> in writing of <u>significant</u> objectionable conditions***, relating to products and/or processes, or other violations . . . which were observed during the inspection." FDA, Inspections and Operations Manual (2022),§ 5.2.3, https://www.fda.gov/media/113432/download (last visited Nov. 4, 2022). Form 483s "should be issued to the most responsible person available at the close of the inspection[,]" ***with a copy to the "top management of the firm***." *Id.* at 5-26.

76. According to the FDA's Inspections Operation Manual, "observations should be ranked in order of significance" and "observations of questionable significance should not be listed[.]" *Id.* at 5-20.

77. The Form 483 issued to Revance contained five "inspectional observations." Ex. A at 1.

78. The first observation pertained to a working cell bank, or WCB that was produced by Revance in November 2012. Ex. A at 1.

79. A WCB is generally derived from one or more master cell banks ("MCB"). *See* European Medicines Agency, ICH Topic Q 5 D Quality of Biotechnological Products: Derivation and Characterisation of Cell Substrates Used for Production of Biotechnological/Biological Products, at 4, European Medicines Agency (Mar. 1998), https://www.ema.europa.eu/en/documents/scientific-guideline/ich-q-5-d-derivation-characterisation-cell-substrates-used-production-biotechnological/biological-products-step-5_en.pdf. The WCB is used to provide cells for the manufacturing process. *Id*. Additional WCBs can be generated from the MCB on an as needed basis. *Id.*

80. According to applicable FDA regulatory guidance, a newly prepared WCB should be appropriately qualified by characterization and testing. *Id.*

81. According to the Form 483, Revance's WCB was used to produce "DS" (*i.e.*, "Drug Substance") lots that were rejected. Ex. A at 1. A Drug Substance is the drug's "active ingredient." 21 C.F.R. § 314.3(b). The Drug Substance lots that were rejected were manufactured in August 2020 and September 2020, well before Revance's initial PDUFA date of November 2020. Ex. B at 5.

82. Specifically, on August 21, 2020, Revance manufactured its first drug substance batch of 2020 from its WCB. Ex. B at 21. It was rejected, which meant that Revance had not produced a commercial scale drug substance lot since September 6, 2019. *Id.* at 23, 50. An investigation concluded that the WCB "did not possess expected performance traits." *Id.* at 21.

83. To confirm that there were issues with the WCB, Revance attempted to manufacture a second drug substance batch on September 25, 2020, which was also rejected. *Id.* at 1, 21.

84. In response to the rejected lots, Revance initiated a quality investigation in September 2020 that ultimately determined in or around December 2020 that the root cause of the issue was the effectiveness of the previously qualified WCB. Ex. A at 1; Ex. B at 22; Ex. C, Revance's Form 483 Response ("Form 483 Response") at 2.[3]

85. After determining the root cause, Revance needed to take action to correct the problem (corrective action) and prevent it from occurring in the future (preventative action) (collectively, "CAPA"). Ex. A at 1. Federal regulations require drug manufacturers to have procedures for implementing CAPA. 21 CFR § 820.10. Revance implemented CAPA in May 2021 and determined that a new WCB should be manufactured and qualified. Ex. A at 1.

86. Notably, the "projected timeline" for completing qualification of the new WCB ***was December 31, 2021—nearly six months after the pre-approval inspection***. Ex. B at 22. With a new WCB not yet qualified, and a previous WCB that produced rejected Drug Substance

---

[3] Revance's Form 483 Response was obtained by Lead Counsel through a Freedom of Information Act Request to the FDA.

lots, the FDA determined that Revance's current release and stability testing methods were insufficient to monitor the quality and shelf-life of its WCBs. Ex. A. at 1. Consequently, Revance's manufacturing facility was not ready for commercial production. *See generally* Ex. A; Ex. B; *see also* Chap. 46 at 15.

87. The Form 483's second observation provides that "[t]he current manufacturing process is not the process proposed for licensure." Ex. A at 1. This refers to a change from the manufacturing process that Revance submitted in its BLA, which was made as part of the CAPA process initiated after determining deficiencies with its WCB. *Id.*

88. Revance's quality control team approved the change on June 15, 2021, and it became effective on June 25, 2021, in the middle of the FDA's inspection of Revance's facility. Ex. A at 1.

89. According to the Form 483, the CAPA process was still open during the FDA's inspection, meaning that the manufacturing process observed by the FDA during the inspection was subject to even further revision. Ex. A at 1.

90. Further, the FDA observed that recent Drug Substance lots manufactured by Revance were using the new process, instead of the process included in Revance's BLA. Ex. A at 1.

91. One of the goals of a pre-approval inspection is to ensure that the manufacturing methods employed are consistent with those submitted with the Company's BLA. *See* Chap. 46 at 27 ("Objective 2: Conformance to Application Verify that the formulating, manufacturing, or processing methods; analytical (or examination) methods); and batch records are consistent with descriptions contained in the CMC section of the application."). According to the FDA, the changes made with respect to the WCB "represent a significant deviation from the [Drug Substance] manufacturing process on file." Ex. B at 22.

92. The third observation provides that "[t]he firm's Quality Unit lacks the responsibility and authority for the control, review, and approval of outsourced activities which

includes the responsibilities and communication processes for quality-related activities in a written agreement." Ex. A at 2.

93. Among other things, the Quality Unit, or Quality Control Unit, has "the responsibility and authority to approve or reject all components, drug product containers, closures, in-process materials, packaging material, labeling, and drug products, and the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated." 21 C.F.R. § 211.22(a).

94. 21 C.F.R. § 211.22(d) requires that the Quality Unit's responsibilities be in writing, and that such written procedures be followed. When outsourcing manufacturing or testing, a written agreement known as a "Quality Agreement" between the Company (here, Revance) and the outsourced facility must ensure compliance with the CGMP regulations in 21 C.F.R. §§ 210 and 211. This written agreement is called a Quality Agreement. *See* FDA, Contract Manufacturing Arrangements for Drugs: Quality Agreements, Guidance for Industry (Nov. 2016) ("Quality Agreement Guidance"), at 6, https://www.fda.gov/media/86193/download (last visited Nov. 4, 2022). The FDA may review Quality Agreements during an inspection. *Id.* at 6.

95. The FDA explained that Revance did not have a Quality Agreement in place with an outsourced facility that it used for testing, a quality-related activity. *See* Ex. A at 2.

96. The third observation also states that this outsourced site was not included in Revance's BLA. This violates 21 C.F.R. § 601.2(a), which requires the address of each location involved in the manufacture of the biological product be listed in the BLA. This information is important because the FDA needs to know the location of the outsourced site to inspect it, if necessary. *See* Quality Agreement Guidance at 8.

97. The fourth observation states that "actual yields and percentages of theoretical yield, indicators of process performance, are not determined at the conclusion of each appropriate phase of manufacturing." Ex. A at 2.

98. "'Actual yield' means the quantity that is actually produced at any appropriate phase of manufacture, processing, or packing of a particular drug product." 21 C.F.R. § 210.3(b)(18).

99. "'Theoretical yield' means the quantity that would be produced at any appropriate phase of manufacture, processing, or packing of a particular drug product, based upon the quantity of components to be used, in the absence of any loss or error in actual production." 21 C.F.R. § 210.3(b)(17).

100. "Percentage of theoretical yield means the ratio of the actual yield (at any appropriate phase of manufacture, processing, or packing of a particular drug product) to the theoretical yield (at the same phase), stated as a percentage." 21 C.F.R. § 210.3(b)(19).

101. Yield matters because any discrepancies between actual yields and percentages of theoretical yield could indicate problems with the drug product's quality and purity. *See* Fed. Reg. Vol. 61, N. 87 (May 3, 1996), at 20108 G. The drug product is the finished dosage form of the drug that contains the drug substance and any additional ingredients required for the drug to work.

102. FDA regulations require that actual yields and percentage of theoretical yields be determined at the conclusion of each appropriate phase. 21 C.F.R. § 211.103. They cannot be determined after the fact or be backdated, as Revance did. *See* Ex. A at 2 ("Current yields are based on a count of the number of rejects documented during the process and total vials produced to back calculate the number of vials issued for the manufacturing filling operations.").

103. The fifth observation provides that "the responsibilities and procedures applicable to the quality control unit are not always in writing." Ex. A at 3. This observation is a violation of 21 C.F.R. § 211.22 (explained above), which requires that the Quality Unit's responsibilities be in writing, and that such written procedures shall be followed.

104. Specifically, the written procedures are missing the step where the analytical worksheet is reviewed to ensure that the data is original and accurate, and the Master Batch Record, is missing full instructions for photo count verification. Ex. A at 3.

105. The Master Batch Record "contains the instructions, recipe or formula, and specific manufacturing process for a particular product." Siemens, *Master batch record*, https://www.plm.automation.siemens.com/global/en/our-story/glossary/what-is-a-master-batch-record-mbr/106448 (last visited Nov. 4, 2022). The FDA requires manufacturers to create and maintain them for each product formulation/recipe and batch size. *Id.* "Master batch records are intended to ensure that manufacturers use the right ingredients and the right processes in the right sequence to make the product as it is designed[,]" so that "product characteristics and performance are the same from batch to batch." *Id.*

106. The photo count verification step missing from the Master Batch Record is for the vials exiting the filler during the "media fill" process. *See* Ex. A. at 3.

107. A "media fill" "is the performance of an aseptic manufacturing procedure using a sterile microbiological growth medium in place of the drug solution . . . to test whether the aseptic procedures are adequate to prevent contamination during actual drug production." FDA Guidance, Media Fills for Validation of Aseptic Preparations for Positron Emission Tomography (PET) Drugs (Apr. 2012), https://www.fda.gov/media/81974/download (last visited Nov. 4, 2022). The medium is then placed in a container, or vial, and sealed. Manjula Ghosh, *Aseptic Process Simulation (Media Fill)*, at 23, https://www.pda.org/docs/default-source/website-document-library/chapters/presentations/southern-california/2019-aseptic-day/aseptic-process-simulation-(media-fill).pdf?sfvrsn=12 (last visited Nov. 4, 2022). Non-integral vials (those with the potential for leakage and contamination), are removed so that only the remaining integral vials (*i.e.*, those not cracked or broken) proceed to the next stage of the media fill process—incubation. *Id.*

108. Photo verification of the vials is important to provide an accurate count of the integral and non-integral vials produced during the media fill. *See* Ex. A at 3.

109. When the FDA issues a Form 483 to a company, the FDA allows fifteen (15) business days to provide a response to the observations contained in the Form 483 before issuing a warning letter. *See* Review of Post-Inspection Responses, 74 Fed. Reg. 40211 (Aug. 11, 2009).

110. Revance responded to the Form 483 in July 2021. *See* Revance, Press Release, *Revance Continues to Anticipate FDA Approval of DaxibotulinumtoxinA for Injection for the Treatment of Glabellar Lines in 2021* (Oct. 12, 2021).

111. According to FDA procedures, substantive communication between the FDA and an applicant, such as Revance, are discouraged from the time an FDA reviewer receives a pre-approval inspection report through the time a Complete Response Letter is issued by the FDA. *See* FDA Center for Drug Evaluation and Research, *Guidance for Review Staff and Industry Good Review Management Principles and Practices for PDUFA Products*, 8-9 *available at* https://www.fda.gov/media/132157/download (last visited Nov. 4, 2022). Despite being in possession of the Form 483, Defendants failed to disclose this information and continued to express confidence that they would receive approval shortly. For example, during the August 5, 2021 earnings call, Foley stated, "[w]ith the FDA having initiated their pre-approval inspection of our manufacturing facility in June, we continue to anticipate the approval of our lead product, DaxibotulinumtoxinA for injection for the treatment of glabellar lines ***this year***. In the meantime, the Revance team is actively building inventory and solidifying our commercial launch plans for innovative neuromodulators." Revance, Q2 2021 Earnings Call, 4 (Aug. 5, 2021) (S&P Global transcript). An analyst commented, "you're expressing a high degree of confidence in the launch. And so I'm assuming that the FDA inspection is going swimmingly." *See id*. at 7. Rather than correct the analyst, Foley stated, *inter alia*, "I think you're sensing consistency with our tone around the expected approval before year-end. We've taken advantage of this time to keep up sort of our readiness for the inspection and continue to advance our commercial preparation plans." *See id.* at 8.

112. The next day, on August 6, 2021, William Blair issued an analyst report stating in relevant part, ". . . the company recently announced that the FDA had conducted the agency's inspection of Revance's manufacturing facility that produces DAXI, one of the final steps prior to a regulatory decision that had been delayed due to the pandemic. ***Management's tone on the call was confident of an approval*** and we believe that when the original timing setback was

communicated in 2020, labeling discussions were well underway and there remained no other outstanding issues. ***Given the positive interactions in the past, the clean data to date that includes the largest neurotoxin data set produced pre-approval, and a state-of-the-art manufacturing facility, we expect an approval of DAXI in the near term with the first meaningful sales in the fourth quarter***." William Blair, *Second-Quarter Earnings; Strong RHA Launch Continues as We Wait for DAXI Approval and Launch, Remain Outperform*, at 1 (Aug. 6, 2021).

113. Defendants did nothing to correct this impression, with Foley informing investors during a September 9, 2021 conference call that Revance had "***a very typical inspection***" and continuing to express confidence that it would receive approval shortly. *See* Revance, Company Conference Presentation, 6 (Sept. 9, 2021) (S&P Global transcript).

114. On October 7, 2021, Barclays stated, ". . . 2021 approval expectations for DAXI are still intact, and we currently factor revenues trickling in from Q4 onward." Barclays, *ABBV Lawsuit Looks Tactical; Framing Our Grey-Sky Scenario*, at 2 (Oct. 7, 2021).

## II. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[4]

### A. Statements Made Before The Pre-Approval Inspection

115. The Class Period begins on November 25, 2019, when Revance issued a press release entitled, "Revance Submits Biologics License Application (BLA) to the FDA for DAXI to Treat Glabellar (Frown) Lines." The press release stated, in relevant part:

> "The submission of our BLA represents a significant milestone in the Company's history ***and initiates our transition from a development company to a commercial organization***. I'm incredibly excited about the opportunity to introduce the first truly novel advancement in neuromodulator products in over 30 years. We believe that a long-acting neuromodulator product will fill a significant, unmet need in both aesthetics and therapeutics and that the market is hungry for innovation," said Mark

---

[4] In this section, bold and italicized text indicates what statements are alleged to be false and/or misleading by way of omission. They are shown in context.

> Foley, President and Chief Executive Officer of Revance. ***"As we manufacture our own product in the United States, the BLA filing represents a monumental achievement for a company of our size,*** which was only made possible through the incredible dedication and commitment of our employees. I would like to sincerely thank all of those involved for their tireless efforts." Foley further commented, "Based on the SAKURA trial results, DAXI has the potential to provide patients with lasting, natural-looking frown line correction all year long with just two treatments. ***Following this submission, Revance enters a catalyst-rich calendar year of significant clinical trial readouts and meaningful Company milestones, which we believe will culminate in the approval and launch of DAXI in the aesthetic marketplace."***
>
> * * *
>
> Under the current Prescription Drug User Fee Agreement (PDUFA VI), the FDA has agreed to file acceptable applications within 60 days of receipt and to review the majority of BLAs within 10 months following the Day 60 filing date. ***Based on that timeline, Revance anticipates potential product approval in the second half of 2020.***

Revance, Press Release, *Revance Submits Biologics License Application (BLA) to the FDA for DAXI to Treat Glabellar (Frown) Lines* (Nov. 25, 2019).

116. On January 9, 2020, Revance issued a press release providing a corporate update and anticipated milestones for 2020. The press release stated, in relevant part:

> **Corporate Updates**
>
> - Acceptance of BLA Submission for DaxibotulinumtoxinA for Injection (DAXI) in Glabellar Lines Expected Q1 2020 – In November 2019, Revance submitted its Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for DAXI in the treatment of moderate-to-severe frown lines. In the Phase 3 pivotal program, the median time to loss of none or mild wrinkle severity was 24 weeks and the median time to return to baseline wrinkle severity was approximately 28 weeks. ***Revance anticipates acceptance of the submission in the first quarter and projects potential approval in the fourth quarter of 2020***. Subject to approval, the company plans to initiate commercialization activities before year end.
>
> * * *
>
> "***This is a very exciting and pivotal year for Revance, with not only a number of significant clinical data read-outs, but also the expected U.S. approval and launch of our next generation neuromodulator product, DAXI***," said Mark Foley, President and Chief Executive Officer of Revance. "Our near-term focus is on completing the BLA approval process and finalizing our launch strategies to garner

> a meaningful share in the $1.4 billion* U.S. neuromodulator market. DAXI will create a new, long-lasting neuromodulator product category, delivering a premium experience that could require as few as two treatments per year and potentially provide patients with lasting, natural-looking frown line correction all year long. Although DAXI will be commercialized first in an aesthetics indication, we plan to unlock the long-term value of DAXI in an array of therapeutic indications, with clinical trials currently underway in cervical dystonia, upper limb spasticity and plantar fasciitis."
>
> **Near-Term Milestone Expectations**
>
> **Aesthetics:**
>
> - Acceptance by the FDA of BLA submission for DAXI in glabellar lines expected in 1Q 2020. Potential approval anticipated in 4Q 2020

Revance, Press Release, *Revance Provides Corporate Update and Anticipated Milestones for 2020* (Jan. 9, 2020).

117. The statements in ¶¶115-16 were materially false and/or misleading when made because Revance and Foley knowingly and/or recklessly made the statements while omitting the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020; and

(c) These omissions rendered Revance's and Foley's statements concerning the status of the BLA materially misleading to a reasonable person reading the statements fairly and in context.

118. On February 6, 2020, Revance issued a press release entitled, "Revance Announces U.S. FDA Acceptance of Biologics License Application (BLA) for DAXI to Treat Glabellar (Frown) Lines." The press release stated, in relevant part:

> ***Revance [. . .] today announced that the [DAXI BLA] has been accepted for review by the [FDA]. In its correspondence, FDA stated that no potential filing review issues were identified. The FDA set an action date of November 25, 2020 under the Prescription Drug User Fee Act (PDUFA) VI program***. The Agency also indicated in the BLA filing communication letter that it is not currently planning to hold an advisory committee meeting to discuss the application.
>
> "***The FDA's acceptance of our BLA for our next-generation neuromodulator product, DAXI, is a significant achievement for Revance and a crucial step forward*** as we look to establish a new, premium, long-lasting neuromodulator category," said Mark Foley, President and Chief Executive Officer of Revance. "The patient experience has remained largely unchanged since botulinum toxin type A treatments were first introduced over 30 years ago. If approved, we expect that patients treated with DAXI may achieve lasting, natural-looking frown line correction all year long with as few as two treatments."

Revance, Press Release, *Revance Announces U.S. FDA Acceptance of Biologics License Application (BLA) for DAXI to Treat Glabellar (Frown) Lines* (Feb. 6, 2020).

119. On February 24, 2020, Revance issued a press release announcing the Company's Q4 and full year 2019 financial results and providing a corporate update. The press release stated, in relevant part:

> **Key Fourth Quarter 2019 Events and Subsequent Updates**
>
> Commercial:
>
> - **BLA for DAXI in Glabellar Lines Accepted by FDA, PDUFA Date Announced**. In February, the company received U.S. Food and Drug Administration (FDA) notification that its Biologics License Application (BLA) for DAXI in the treatment of moderate to severe glabellar (frown) lines was accepted for review. Revance has been given a target action date under the Prescription Drug User Fee Act (PDUFA) of November 25, 2020.
>
> * * *
>
> "***With the FDA's recent acceptance of our BLA submission for DAXI in glabellar lines, and the announcement of our distribution agreement for TEOXANE's RHA® technology, Revance has constructed an exceptional start to what we believe will be a transformational year for the company. These milestones represent the first two of twelve potential value inflection points for our company in 2020***," said Mark J. Foley, President and Chief Executive Officer of Revance.

Revance, Press Release, *Revance Reports Fourth Quarter and Full Year 2019 Financial Results, Provides Corporate Update* (Feb. 24, 2020

120. The statements in ¶¶118-19 were materially false and/or misleading when made because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi omitted the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020;

(c) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA misleading to a reasonable person reading the statements fairly and in context.

121. That same day, Revance hosted an earnings call with investors and analysts to discuss the Company's Q4 2019 results (the "Q4 2019 Earnings Call"). Foley, Schilke, and Joshi were among the attendees. During the scripted portion of the Q4 2019 Earnings Call, Defendant Foley stated, in relevant part:

> In 2019, Revance made significant progress in the initiation and enrollment of several important clinical trials while also submitting a biologics license application to the U.S. Food and Drug Administration for our neuromodulator, DaxibotulinumtoxinA for injection or DAXI for short for the treatment of glabellar lines. ***This progress has set us up for a transformational 2020, a year which we believe will be characterized by excitement and execution. 2020 contains no less than 12 transformative clinical, regulatory and commercial events that could generate significant value for our company and position Revance to be an innovation leader in both aesthetics and therapeutics.***
>
> * * *
>
> Following on the heels of our TEOXANE deal, ***we were notified that our BLA for DAXI for glabellar lines was accepted for review by the FDA. In its correspondence, the FDA stated that no potential filing review issues were identified and that there are currently no plans to hold an advisory committee meeting. The FDA also set the PDUFA target action date of November 25, 2020. We remain focused on ensuring a successful FDA review process and***

> ***have confidence in the quality of our submission and the experience of our team***.

Revance, Q4 2019 Earnings Call, 4-5 (S&P Global, Inc. transcript).

122. The statements in ¶121 were materially false and/or misleading when made because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi knowingly and/or recklessly omitted the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020;

(c) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA misleading to a reasonable person reading the statements fairly and in context.

123. On February 26, 2020, Revance filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Foley and Schilke and stated, in relevant part:

> Revance Therapeutics is a biotechnology company, developing new innovations in neuromodulators for aesthetic and therapeutic indications. Our lead product candidate, DaxibotulinumtoxinA for Injection (DAXI), combines a proprietary stabilizing peptide excipient with a highly purified botulinum toxin that does not contain human or animal-based components. We have successfully completed a Phase 3 program for DAXI in glabellar (frown) lines. In November 2019, we submitted the Biologics License Application ("BLA") to the U.S. Food and Drug Administration (the "FDA") for DAXI in the treatment of moderate to severe glabellar (frown) lines. The FDA accepted the BLA on February 5, 2020, and the Prescription Drug User Fee Act ("PDUFA") target action date is November 25, 2020. If the BLA is approved on or by the target action date, we plan to initiate commercialization activities for DAXI for the treatment of glabellar lines before

> year end 2020. We are also evaluating DAXI in upper facial lines - glabellar lines, forehead lines and crow's feet combined - as well as in three therapeutic indications - cervical dystonia, adult upper limb spasticity and plantar fasciitis, with plans to study migraine.
>
> * * *
>
> **Manufacturing and Operations**
>
> We have established capabilities for the production of botulinum toxin type A, including bulk drug substance and injectable finished drug product. Botulinum toxin is regulated as a Tier 1 Select Agent under authority of the Centers for Disease Control and Prevention ("CDC"), and as such requires that we obtain a select agent registration and perform our operations in compliance with CDC regulations. We are in good standing under our select agent registration with the CDC. ***We have assembled a team of experienced individuals in the technical disciplines of chemistry, biology, biosafety, and engineering and have appropriately equipped laboratory space to support ongoing research and development efforts in our botulinum toxin product development platform. We have the ability to manufacture our own botulinum toxin bulk drug substance to support our clinical trial programs and eventually, our commercial production.*** We believe that having direct control over our manufacturing processes will enable us to develop additional pharmaceutical product configurations effectively and with a competitive cost structure.
>
> * * *
>
> ***Drug Product Manufacturing***
>
> Manufacture of dose forms to support the DAXI programs is currently performed at our fill-finish facility. The manufacturing process consists of bulk compounding, liquid fill and freeze-drying to support acceptable shelf-life duration. We plan to perform further scale-up of DAXI drug product manufacturing to meet anticipated commercial demand and may utilize internal capacity, a third-party manufacturer such as Althea or a combination of both.

Revance, Annual Report (Form 10-K), 1, 10 (filed Feb. 26. 2020).

124. Appended to the 2019 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, attesting that, "[t]he information contained in the [2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* Revance, Annual Report (Form 10-K), Exs. 32.1, 32.2 (filed Feb. 26, 2020).

125. The statements in ¶¶124-24 above were materially false and/or misleading because Revance, Foley, and Schilke knowingly and/or recklessly made the statements while omitting the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020; and

(c) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and the Company's manufacturing abilities misleading to a reasonable person reading the statements fairly and in context.

126. On May 7, 2020, Revance hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call"). Foley, Schilke, and Joshi were among the attendees. During the scripted portion of the Q1 2020 Earnings Call, Defendant Foley stated, in relevant part:

> As we adapt to the new world shaped by the COVID-19 pandemic, Revance does so from a position of financial, operational and product portfolio strength. We are very well funded with more than $0.5 billion in cash and investments as of March 31. We have an FDA- approved RHA dermal filler portfolio, we are readying for launch in the U.S. in the third quarter. ***Our PDUFA date for DaxibotulinumtoxinA for Injection remains on schedule for November 25***, and our key clinical development plans remain on track to deliver top line results for multiple Phase II studies and a Phase III pivotal trial this year.
>
> * * *
>
> Now let me cover DaxibotulinumtoxinA for Injection. ***To date, we have not received any indication from the FDA that our PDUFA date will change and our commercial launch is still planned for year-end. Revance is a vertically integrated manufacturer with DaxibotulinumtoxinA for Injection produced at our headquarters in California. As a result, we've been fortunate to avoid any supply chain or production issues related to the COVID-19 situation, and we***

> ***continue to work with the FDA toward our November 25 PDUFA date***. Once we combine DaxibotulinumtoxinA for Injection with our range of RHA dermal fillers, we'll have a synergistic portfolio of products to establish a whole new prestige segment in the facial injectables market and that will provide both physicians and consumers with a truly differentiated alternative.

Revance, Q1 2020 Earnings Call, 4, 7 (May 7, 2020) (S&P Global, Inc. transcript).

127. The statements in ¶126 above were false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi knowingly and/or recklessly omitted the following facts:

(a) Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020; and

(c) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and timing of DAXI's commercial launch misleading to a reasonable person reading the statements fairly and in context.

128. On August 6, 2020, Revance hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call"). Foley, Schilke, and Joshi were among the attendees. During the scripted portion of the Q2 2020 Earnings Call, Defendant Foley stated, in relevant part:

> Now, let me make a brief statement on our lead asset DaxibotulinumtoxinA for Injection given the COVID-19 environment. ***Our PDUFA date for DaxibotulinumtoxinA for Injection in glabellar lines remains November 25th and as such we are busy preparing for a potential commercial launch of our next-generation neuromodulator before year end***.

* * *

> This is a pivotal and exciting time at Revance. Having created what we believe to be a compelling portfolio of leading assets in aesthetics, we stand on the cusp of commercialization not just of our RHA Collection of dermal fillers and HintMD fintech platform, but also, subject to approval, of the world's first, true, next-generation long-acting neuromodulator, DaxibotulinumtoxinA for Injection.

Revance, Q2 2020 Earnings Call, 5, 8 (Aug. 6, 2020) (S&P Global, Inc. transcript).

129. The statements in ¶128 above were false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi knowingly and/or recklessly omitted the following facts:

(a) Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted, and therefore materially decreased the likelihood that DAXI would be commercialized in 2020; and

(c) These false statements and omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and timing of DAXI's commercial launch misleading to a reasonable person reading the statements fairly and in context

130. On November 9, 2020, Revance issued a press release announcing the Company's Q3 2020 financial results and providing a corporate update. The press release stated, in relevant part:

> **Third Quarter 2020 and Subsequent Updates**
>
> **<u>Revance Aesthetics</u>**
>
> * * *
>
> • **Due to COVID-Related Travel Restrictions, Required Inspection of the Revance Manufacturing Site by the U.S. Food and Drug Administration (FDA) has Not Been Scheduled**. Today, Revance disclosed that, with 16 days left before its Prescription Drug User Fee Act (PDUFA) action date of November 25, 2020, the FDA has not scheduled a manufacturing site inspection related to the company's Biologics License

> Application (BLA) for DaxibotulinumtoxinA for Injection in the treatment of moderate to severe glabellar (frown) lines. The FDA has indicated that an inspection of the Newark, Calif. manufacturing site will be required prior to approval. Revance continues to work proactively with the FDA to secure an inspection at the earliest possible time.
>
> * * *
>
> "Finally, today, we shared that the FDA has not yet scheduled a site inspection at our Newark, CA manufacturing facility as part of our BLA submission. We understand this is due to COVID-19-related travel restrictions at the Agency. While there is still time for an inspection to take place before our PDUFA date of November 25th, and though the company continues to work proactively with the Agency, we felt it was appropriate to provide an update. ***Importantly, should the anticipated approval of DaxibotulinumtoxinA for Injection in glabellar lines be delayed, we believe that Revance is in a strong position, both commercially and financially, to weather any near-term change in timing. Just as importantly, we remain confident in the strength of our BLA submission for DaxibotulinumtoxinA for Injection in the treatment of glabellar lines***."

Revance, Press Release, *Revance Reports Third Quarter 2020 Financial Results and Provides Corporate Update* (Nov. 9, 2020).

131. The statements in ¶130 above were false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while omitting the following facts:

(a) Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company had not yet determined the root cause of the problem;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted; and

(e) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA misleading to a reasonable person reading the statements fairly and in context.

132. That same day, Revance hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call"). Foley, Schilke, and Joshi were among the attendees. During the call, Defendant Foley stated in relevant part:

> Now let me address the potential for a delay to our approval associated with our outstanding BLA submission for DaxibotulinumtoxinA for Injection in glabellar lines, which we shared in our third quarter financial release. As reported by several biotech companies, the FDA has been delaying some site inspections and corresponding drug approvals due to COVID-related travel restrictions. With just 16 days to go until our previously announced PDUFA date of November 25, we felt it was appropriate to provide an update on our status. As of today, the FDA has yet to schedule a site inspection of our U.S.-based manufacturing facility in Newark, California. The agency has previously noted that a site inspection is required prior to approval of our BLA. The FDA has also communicated that their ability to conduct inspections is limited based on their COVID-19 related guidance and travel restrictions currently in place. While there's still a chance that an inspection could be conducted prior to November 25, we wanted to acknowledge the possibility that our drug might not be approved on our PDUFA date.
>
> At this time, we do not have any additional information and do not plan to elaborate further. We continue to work proactively with the agency to secure an inspection at the earliest possible time. With the strategic transactions we made earlier this year of the RHA Collection and HintMD platform, Revance is more diversified than ever before and less dependent on any single revenue stream.
>
> Revance's cash guidance remains unchanged as we continue to project that the company is funded into 2023 due to the puts and takes associated with the new product launch. Should we have a delay to our FDA approval, we believe the company is in an excellent position, both commercially and financially, to weather any change to the timing of a potential approval. ***We also remain confident in the overall strength of our BLA submission, and we'll continue to work proactively with the agency to complete the necessary site inspection***.

Revance, Q3 2020 Earnings Call, 6-7 (Nov. 9, 2020) (S&P Global, Inc. transcript).

133. In response to an analyst's questions about the BLA's status, Foley stated in relevant part:

> [Analyst]: And I just want to confirm if you know if the inspectors would need to come out and they're not regional inspectors. I know that there's been a movement kind of away from local inspectors and more towards national teams depending on the indications and, I guess, product. Or if you're just deducing that the travel restrictions are what is the

> hurdle? And maybe you mentioned this already, but can you just confirm if the inspection is the last major issue outstanding in the review?
>
> [Foley]: Yes. So Tim, great questions. So in terms of the -- what we've heard from the agency, what they have confirmed is that they will need to perform a site inspection. I think that has to do with the fact that we have not qualified this manufacturing site for any other product. So this will be our first approval, which is why an inspection does need to take place. What they've pointed us to is kind of their prior guidance of saying that here's sort of the guidance. We've got protocols we've got to follow, and that travel-related restrictions will impact that. That's basically what we know today.
>
> We are continuing to work proactively. Our PDUFA date has not come yet. We're still hopeful that perhaps the inspection will take place prior to then. But as we mentioned earlier, with now being 16 days away from the PDUFA and no site visit scheduled, knowing that we need to have one, we thought it was appropriate to share with you. Again, we do feel good that we're a U.S. single-site manufacturing facility here in Northern California. So we are anxiously awaiting that. We've not commented on any other details around the actual BLA submission. We don't think it's appropriate other than to say that ***we continue to feel very good about the quality of the submission that we put in and we continue to work collaboratively with the agency***. And was there a second part of the question?
>
> [Analyst]: I guess you maybe touched on it, just if it was the kind of last outstanding issue for the review, but it sounds like you're very comfortable with the quality. ***If you were -- if the inspection were to occur tomorrow and there were some 483s, would you even be able to turn them around given the schedule? And should we just kind of assume a delay as of now?***
>
> [Foley]: I don't -- I mean, great questions. I think we're theorizing. I think we're just trying to share what information we definitely know. I think that as we start getting into the potential of this or that, it's hard to say. We're not to the clock. I know this is sort of atypical to report this out prior to the PDUFA date, but we just -- we thought it was the appropriate thing to do given the company update. ***So it's hard to theorize sort of whether or not we could, if there's anything that were to come up, but we're ready. We're ready for them whenever they show up.***

Revance, Q3 2020 Earnings Call, 14-15 (Nov. 9, 2020) (S&P Global, Inc. transcript .

134. The statements in ¶¶132-33 above were false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi knowingly and/or recklessly omitted the following facts:

(a) Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company had not yet determined the root cause of the problem;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted;

(e) Accordingly, the Company was not "ready" for the pre-approval inspection; and

(f) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and Revance's readiness for the pre-approval inspection misleading to a reasonable person reading the statements fairly and in context.

135. On November 25, 2020, Revance issued a press release titled, "FDA Defers Approval of DaxibotulinumtoxinA for Injection in Glabellar Lines Due to COVID-19 Related Travel Restrictions Impacting Manufacturing Site Inspection." The press release stated, in relevant part:

> In a communication received on November 24, 2020, the FDA reiterated that an inspection of the company's manufacturing facility is required as part of the BLA approval process. The Agency was unable to conduct a required inspection of the company's Northern California manufacturing facility due to the Agency's travel restrictions associated with the COVID-19 pandemic. Revance confirmed with the FDA that their communication was not a Complete Response Letter.
>
> ***Though the company's BLA is still under review, the FDA did not indicate there are any other review issues at this time, beyond the on-site inspection.*** The FDA stated they are actively working to define an approach for scheduling outstanding inspections, once safe travel may resume and based on public health need and other factors.
>
> "We appreciate FDAs engagement on the Chemistry, Manufacturing and Controls (CMC), non-clinical, clinical and labeling sections of our BLA, particularly given the unique and unprecedented situation we are in as a result of the COVID-19 pandemic. We look forward to continued interaction with the Agency and ***remain ready to support FDAs pre-approval inspection as soon as possible.*** We are fortunate that we manufacture our product at a single location in the U.S., which should put us at an advantage compared to international manufacturing locations once travel resumes," said Mark J. Foley, President and Chief Executive Officer.

> "As stated in our third quarter earnings, with the addition of the RHAO Collection of dermal fillers and acquisition of the HintMD fintech platform earlier this year, we believe the company is in an excellent position, both commercially and financially, to weather a change to the timing of this potential approval."

Revance, Press Release, *FDA Defers Approval of DaxibotulinumtoxinA for Injection in Glabellar Lines Due to COVID-19 Related Travel Restrictions Impacting Manufacturing Site Inspection* (Nov. 25, 2020).

136. On January 7, 2021, Revance issued a press release providing a corporate update and anticipated milestones for 2021. The press release stated, in relevant part:

> In 2021, we hope to receive our first FDA approval for our next-generation neuromodulator, DaxibotulinumtoxinA for Injection, for the treatment of glabellar lines, further refine our therapeutics strategy and continue to execute on our focused and disciplined launch in aesthetics.
>
> * * *
>
> **Aesthetics Franchise Update:**
>
> - **Biologics License Application (BLA) Approval for DaxibotulinumtoxinA for Injection in the Treatment of Glabellar Lines Anticipated in 2021**. On November 25, 2020, the company announced that the United States (U.S.) Food and Drug Administration (FDA) has deferred a decision on the BLA for DaxibotulinumtoxinA for Injection due to the FDA's inability to conduct a required inspection of the company's Northern California manufacturing facility as a result of COVID-19 pandemic travel restrictions. The inspection of the company's manufacturing facility is required by the FDA as part of the BLA approval process. ***Though the company's BLA is still under review, the FDA did not indicate any further outstanding review issues beyond the pending on-site inspection***. ***The company remains confident in its BLA submission and continues to work proactively with the FDA on a pre-approval inspection as soon as possible in 2021.***

Revance, Press Release, *Revance Provides Corporate Update and Anticipated Milestones for 2021* (Jan. 7, 2021).

137. The statements in ¶¶135-36 above were false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while omitting to disclose that:

(a) Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company determined in or around December 2020 that the ineffectiveness of its Working Cell Bank was the root cause;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The Company had not yet implemented CAPA to fix the problem;

(e) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted;

(f) Accordingly, Revance did not "remain ready" to support FDAs pre-approval inspection as soon as possible; and

(g) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and Revance's readiness for the pre-approval inspection misleading to a reasonable person reading the statements fairly and in context.

138. On February 25, 2021, Revance filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Foley and Schilke and stated, in relevant part:

> Revance is a biotechnology company focused on innovative aesthetic and therapeutic offerings, including its next-generation neuromodulator product, DaxibotulinumtoxinA for Injection. DaxibotulinumtoxinA for Injection combines a proprietary stabilizing peptide excipient with a highly purified botulinum toxin that does not contain human or animal-based components. We have successfully completed a Phase 3 program for DaxibotulinumtoxinA for Injection in glabellar (frown) lines and are pursuing U.S. regulatory approval.
>
> * * *
>
> On November 24, 2020, the FDA deferred its decision on the BLA. The FDA reiterated that an inspection of our manufacturing facility is required as part of the BLA approval process, but the FDA was unable to conduct the required inspection of our manufacturing facility in Newark, California due to the FDA's travel restrictions associated with the COVID-19 pandemic. ***Though our BLA is***

> ***still under review, the FDA did not indicate there were any other review issues at the time beyond the on-site inspection***
>
> **Manufacturing and Operations**
>
> We have established capabilities for the production of botulinum toxin type A, including bulk drug substance and injectable finished drug product. Botulinum toxin is regulated as a Tier 1 Select Agent under authority of the Centers for Disease Control and Prevention ("CDC"), and as such requires that we obtain a select agent registration and perform our operations in compliance with CDC regulations. We are in good standing under our select agent registration with the CDC. ***We have assembled a team of experienced individuals in the technical disciplines of chemistry, biology, biosafety, and engineering and have appropriately equipped laboratory space to support ongoing research and development efforts in our botulinum toxin product development platform. We have the ability to manufacture our own botulinum toxin bulk drug substance to support our clinical trial programs and eventually, our commercial production.*** We also plan to use third-party manufacturers to further scale-up DaxibotulinumtoxinA for Injection drug product manufacturing to meet anticipated commercial demand in the event of BLA approval.
>
> * * *
>
> ***Drug Product Manufacturing***
>
> Manufacture of dose forms to support the DaxibotulinumtoxinA for Injection programs is currently performed at our fill-finish facility. The manufacturing process consists of bulk compounding, liquid fill and freeze-drying to support acceptable shelf-life duration. We plan to perform further scale-up of DaxibotulinumtoxinA for Injection drug product manufacturing to meet anticipated commercial demand and may utilize current and additional internal capacity, a third-party manufacturer such as ABPS or a combination of both.

Revance, Annual Report (Form 10-K), 1, 7, 13-14 (filed Feb. 25, 2021).

139. Appended to the 2020 10-K as exhibits were signed certifications pursuant to SOX by the Individual Defendants, attesting that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* Revance, Annual Report (Form 10-K), Exs. 32.1, 32.2 (filed Feb. 25, 2021).

140. The statements in ¶¶138-39 above were materially false and/or misleading because Revance, Foley, and Schilke knowingly and/or recklessly made the statements while omitting the following facts:

(a) Quality Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company determined in or around December 2020 that the ineffectiveness of its Working Cell Bank was the root cause;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The Company had not yet implemented CAPA to fix the problem;

(e) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted; and

(f) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and the Company's manufacturing abilities misleading to a reasonable person reading the statements fairly and in context.

141. On March 3, 2021, Revance participated in the Cowen 41st Annual Healthcare Conference. Foley and Schilke were among the attendees. During the conference, Foley stated in response to an analyst's question:

> [Analyst]: So the last question, and you probably thought it would be the first but I'm saying it's the last, is on inspection. We're waiting -- and I don't know if I surprise you by holding out this long before asking. But any updates you can give us around that? And obviously, an unfortunate situation we're all experiencing in your organization, besides the human level you're experiencing on a product level, the COVID issue.
>
> So can you just talk about maybe when we could expect a hopeful resolution or any interactions that could give you any sense of when that might resolve?
>
> [Foley]: Yes. Unfortunately, there's not a whole lot we can say there. On our earnings call recently, we said that it's typical company policy not to comment on where we are in the agency discussions. I think that there's periodic communication that the agency puts out that relates to kind of the industry more as a whole.

> We did break tradition back prior to our PDUFA date, knowing that we weren't going to have an on-site inspection prior to the time frame. So we did actually indicate that. ***But we're -- not a whole lot when we say we're building inventory. We're anxious to get the product approval. As of the date -- as of our PDUFA date, we indicated at that point in time, the only thing that we were aware of that was outstanding was the facility inspection. So we're looking forward to getting on -- the product on the market as soon as we can.***

Revance, Presents at Cowen 41st Annual Health Care Conference, 12 (Mar. 31, 2021) (S&P Global Inc. transcript).

142. The statements in ¶141 above were materially false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, and Schilke omitted the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company determined in or around December 2020 that the ineffectiveness of its Working Cell Bank was the root cause;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The Company had not yet implemented CAPA to fix the problem;

(e) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted; and

(f) These omissions rendered Revance's and Foley's statements concerning the status of the DAXI BLA and the Company's building of inventory misleading to a reasonable person reading the statements fairly and in context.

143. On May 10, 2021, Revance issued a press release announcing the Company's Q1 2021 financial results and providing a corporate update. The press release stated, in relevant part:

> "We are very pleased with our commercial execution in the first quarter, particularly given the impact of COVID-19 and seasonality, where the first quarter is traditionally a slower time of the year for the aesthetics market. We are also encouraged by the progress we are making in our therapeutics franchise as we begin laying the groundwork for our first anticipated approval in the treatment of muscle movement disorders," said Mark Foley, President and Chief Executive Officer. "Our FDA approval for DaxibotulinumtoxinA for Injection for glabellar lines remains under review with a deferred action due to COVID-related travel restrictions. ***We stand ready for the pre-approval inspection of our manufacturing facility and are actively engaging with the FDA to schedule an inspection date as soon as possible. We continue to anticipate an approval this year and, as we have noted before, the FDA did not indicate that there were any other review issues beyond the pending inspection***."

Revance, Press Release, *Revance Reports First Quarter 2021 Financial Results, Provides Corporate Update* (May 10, 2021).

144. That same day, Revance hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q2 2021 Earnings Call"). Foley, Schilke, and Joshi were among the attendees. During the call, Defendant Foley stated, in relevant part:

> As of today, the FDA has not scheduled or conducted the preapproval inspection of our Northern California manufacturing facility due to COVID-19-related travel restrictions. While we had expected to have an inspection date by now, we continue to engage with the FDA and leverage all available resources to facilitate an inspection as soon as possible.
>
> We're also encouraged to see the FDA recently issued its most comprehensive guidance to date, which outlined the agency's planned inspection approach going forward. Combined with the ramp-up in vaccinations across the country, the decline in COVID cases, particularly in the geographic area of our manufacturing site, we anticipate that we will be provided an inspection date in the near term.
>
> Furthermore, we will now make an announcement once we receive the official communication from the FDA regarding our inspection timing. As a reminder, the approval of our BLA by the PDUFA date of November 25, 2020 was deferred due to FDA's inability to conduct an inspection of our facility due to COVID-related travel restrictions.
>
> ***Importantly, the FDA did not indicate any other outstanding review issues beyond the pending inspection, and we did not receive a complete response letter. We <u>remain ready</u> to support an on-site inspection as soon as the agency is able to visit our facility. And we continue to build drug product inventory in anticipation of approval and are eager to introduce this unique product into the aesthetics market***.

Revance, Q1 2021 Earnings Call, 4-5 (May 10, 2021) (S&P Global, Inc. transcript).

145. The statements in ¶¶143-44 above were materially false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, Schilke, and Joshi knowingly and/or recklessly omitted the following facts:

(a) Quality control deficiencies existed with respect to the Company's manufacturing, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company determined in or around December 2020 that the ineffectiveness of its Working Cell Bank was the root cause;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The Company implemented CAPA on May 5, 2021 to fix this, pursuant to which it needed to manufacture and quality a new Working Cell Bank, which was not projected to be qualified until December 31, 2021;

(e) The CAPA required changing the manufacturing process from the process set forth in the BLA;

(f) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted;

(g) Accordingly, Revance did not "remain ready to support an on-site inspection"; and

(h) These omissions also rendered the statements concerning the status of the DAXI BLA and the Company's readiness to support a pre-approval inspection, "misleading to a reasonable person reading the statements fairly and in context.

146. On June 8, 2021, the Company attended the Goldman Sachs 42nd Annual Global Healthcare Conference. Foley and Schilke were among the attendees. Defendant Foley stated, in relevant part:

> [Analyst]: Okay, okay, great. Maybe just moving on to DAXI, obviously a big step forward in terms of getting this FDA inspection lined up for this month. So maybe just walk us through, under a typical kind of process, how much back and forth -- after the inspection happens, how much back and forth is there? How long does that process typically take? Recognize that nothing is typical about the last 12 months or so, but how should we think about at least maybe the bookends?
>
> [Foley]: Yes. Well, when you're in a PDUFA setting, you have multiple work streams that are happening in parallel, right? So that's the environment that we all are familiar with and aware of. So normally, from the time they show up to the time you get approval, that can be kind of a 6- to 8-, 6- to 10-week type of process, depending on what happens. They're on site for 2 to 3 weeks. There's probably some questions that they have which either you satisfactorily answer; or you don't, in which case you get a CRL, but typically there's questions that you answer to try and address what they raise. And some things might even be kind of post-market commitments that you make. And then as part of the overall package, it goes through internal sign-off, which can take a couple of weeks to get everything signed off. In this sort of COVID situation, where in our case that was the only thing that was outstanding, it's hard to know exactly will this process fall into those time windows. Will it be quicker in terms of inspection? Will it take a little longer? And then on the back end of that, how quickly will sort of the final pieces get signed off on?
>
> So we're -- we don't have a ton of visibility to that. We're cautiously optimistic that it will follow a similar pathway***. We feel very good in terms of our preparedness***. ***Certainly with that extra time, we've done additional work internally from a mock inspection and stuff and continue to build product in preparation for launch,*** but again in kind of a -- part of a PDUFA would be probably this kind of 6- to 10-week type of process post them being in. And then what that sign-off process would look like in this environment, it's hard to know.
>
> [Analyst]: Okay, okay, understood. And then -- so then would -- how much more visibility would you give us between now and then? Or is it pretty much just going to be, when you get the approval decision, that's kind of the next update we'll have in terms of the Street?
>
> [Foley]: ***That will be the next update. Obviously if there was something that was not favorable, we would certainly release that, but really the next update would be approval.*** Again, we broke sort of our traditional protocol, which hopefully investors can appreciate, which is normally when you're in those, those are confidential discussions. There's a lot of back and forth, a lot of things. Typically we wouldn't make those comments. We obviously did before PDUFA date because, at that point in time, it was obvious they weren't going to show up in time for that to happen given everything going on with the pandemic. And we also thought it was important, given this uncertainty of, okay, there is no clear path forward, that we at least tell people, hey, this is what's happening. This is the last gating item. And so the next announcement would be approval.

Revance, Presents at Goldman Sachs 42nd Annual Global Healthcare Conference, 9-10 (June 8, 2021) (S&P Global, Inc. transcript).

147. The statements in ¶146 above were materially false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, and Schilke knowingly and/or recklessly omitted following facts:

(a) The Quality control deficiencies existed at the Company's manufacturing facility for DAXI, including the lack of a Quality Agreement with the leased testing facility and the failure to include the facility in its BLA;

(b) Two of the Company's drug substance lots, produced in August and September 2020, were rejected and the Company determined in or around December 2020 that the ineffectiveness of its Working Cell Bank was the root cause;

(c) As a result, the Company had been unable to manufacture a "commercial batch" of drug substance since September 6, 2019;

(d) The Company implemented CAPA on May 5, 2021 to fix this, pursuant to which it needed to manufacture and quality a new Working Cell Bank, which was not projected to be qualified until December 31, 2021;

(e) The CAPA required changing the manufacturing process from the process set forth in the BLA;

(f) The foregoing deficiencies materially decreased the likelihood that the BLA would pass the pre-approval inspection and be approved by the FDA as submitted;

(g) These omissions rendered Revance's and Foley's statements about the status of the DAXI BLA and the Company's preparedness for inspection misleading to a reasonable person reading the statements fairly and in context.

**B. Defendants Conceal Receipt of the Form 483**

148. The FDA issued the Form 483 containing the five observations of significant objectionable conditions to Revance on July 2, 2021. *See* Ex. A.

149. Despite Foley's earlier statement that Defendants would tell investors if anything "not favorable" happened during the inspection, Defendants not only concealed receipt of the

Form 483 from investors but also misled the market that there were no issues from the inspection that could delay launching DAXI in 2021. *See* S&P Global Tr. at 10 (June 8, 2021) (quoted at ¶146, *supra*):

150. On August 5, 2021, the Company issued a press release announcing the Company's Q2 2021 results and providing a corporate update. The press release stated, in relevant part:

> ***The FDA initiated their pre-approval inspection of our manufacturing facility in June, and we continue to anticipate approval of DaxibotulinumtoxinA for Injection for the treatment of glabellar lines in 2021. We are actively preparing for the launch*** and once approved, expect DaxibotulinumtoxinA for Injection to underpin our aesthetics franchise and set the standard for neuromodulator performance in therapeutic indications. In the second half of this year, we look forward to the topline results from our ASPEN-OLS Phase 3 open-label, long-term safety study of DaxibotulinumtoxinA for Injection for the treatment of cervical dystonia, as well as an end-of-Phase 2 meeting with the FDA to discuss DaxibotulinumtoxinA for Injection for the treatment of adult upper limb spasticity.
>
> * * *
>
> **Second Quarter Highlights and Subsequent Updates**
>
> **Aesthetics Franchise**
>
> * * *
>
> - **Status of the Biologics License Application (BLA) for DaxibotulinumtoxinA for Injection in the treatment of glabellar lines.** ***Consistent with the company's previous disclosure on the status of the pre-approval inspection, the FDA initiated the inspection of the company's manufacturing facility in June 2021. Revance continues to anticipate receiving approval for DaxibotulinumtoxinA for Injection in 2021 and is actively building inventory and preparing for commercial launch.***

Revance, Press Release, *Revance Reports Second Quarter 2021 Financial Results, Provides Corporate Update* (Aug. 5, 2021).

151. The statements in ¶150 above were materially false and/or misleading because Revance knowingly and/or recklessly made the statements while omitting the following facts:

(a) Defendants had received a Form 483 identifying five significant objectionable conditions on July 2, 2021;

(b) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted; and

(c) These omissions rendered the statements concerning the status of the DAXI BLA and commercial launch misleading to a reasonable person reading the statements fairly and in context.

152. That same day, August 5, 2021, Revance filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2021 (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Foley and Schilke. The Q2 2021 10Q Risk Factors warned in relevant part: "Even though filed with the FDA, ***our BLA <u>may</u> receive a Complete Response Letter or another response from the FDA identifying deficiencies that must be addressed, rather than an approval***." *See* Revance, Quarterly Report (Form 10-Q), 48 (filed Aug. 5, 2021).

153. Appended to the Q2 2021 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, attesting that, "[t]he information contained in the [Q2 2021 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company. *See* Revance, Quarterly Report (Form 10-Q), Exs. 32.1, 32.2 (filed Aug. 5, 2021).

154. The statements in ¶¶152-53 were materially false and/or misleading because Revance, Foley, and Schilke knowingly and/or recklessly made the statements while the following facts:

(a) Defendants had received a Form 483 identifying five significant objectionable conditions on July 2, 2021;

(b) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted; and

(c) These omissions rendered the statements that Revance "may" get a Complete Response Letter or "another response from the FDA identifying deficiencies that must be addressed" misleading to a reasonable person reading the statements fairly and in context.

155. That same day, August 5, 2021, Revance hosted an earnings call with investors and analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call"). Foley and Schilke were among the attendees. During the scripted portion of the Q2 2021 Earnings Call, Defendant Foley stated, in relevant part:

> ***With the FDA having initiated their pre-approval inspection of our manufacturing facility in June, we continue to anticipate the approval of our lead product, DaxibotulinumtoxinA for injection for the treatment of glabellar lines this year***.
>
> ***In the meantime, the Revance team is actively building inventory and solidifying our commercial launch plans for innovative neuromodulators***. We look forward to introducing the first true innovation in the neuromodulator category in over 30 years. And once approved, DaxibotulinumtoxinA for injection will not only anchor our aesthetics portfolio and also lay the foundation for our therapeutics franchise.
>
> * * *
>
> ***In closing, we're very proud of our performance in the first half of the year and anticipate a strong finish in the second half with the potential approval of DaxibotulinumtoxinA for injection*** and further advancement in our therapeutics pipeline. We also remain in a solid financial position with division cash to support our growth initiatives into 2024.

Revance, Q2 2021 Earnings Call at 4, 6 (Aug. 5, 2021) (S&P Global, Inc. transcript).

156. During the Q2 2021 Earnings Call, an analyst stated, "you're expressing a high degree of confidence in the launch. And so I'm assuming that the FDA inspection is going swimmingly." Foley did not correct the analyst, but instead responded, in relevant part:

> [Analyst]: Great. And then just as the second question very quickly on just obviously, you're expressing a high degree of confidence in the launch. And so I'm assuming that the FDA inspection is going swimmingly. Maybe you could just give us a general sense of how you would encourage us to think about the launch and uptake, obviously, given your premium strategy in the fourth quarter versus how we should think about the rollout through the balance and maybe just without guiding specifically, but just kind of the rollout through the balance of 2022.
>
> [Foley]: ***Yes.*** Thanks for asking that. First, on the FDA process and where we're at, consistent with prior commentary, we indicated that prior to our PDUFA date, everything had been addressed except for the onsite inspection as part of our PAI, where we press released that an inspection date had not been scheduled yet. And then due to the FDA delays, we were in a bit of a holding pattern waiting for that to occur. Given that this is our first drug approval, remote inspection without possibility and they're going to need to physically inspect the plant. We then in the spring, put out a press release that we've been given an inspection date to occur before the end of Q2. And obviously, in our press release and in our remarks, the FDA has shown up at our facility. ***So we continue to feel very good that they're following sort of through with the expected inspection plan.***
>
> ***I think you're sensing consistency with our tone around the expected approval before year-end. We've taken advantage of this time to keep up sort of our readiness for the inspection and continue to advance our commercial preparation plans.***
>
> In terms of the launch trajectory, we've also tried to be consistent. This will be the first time that our product has been used outside of clinical trials. And as a result, we're going to be sort of very thoughtful and intentional in the first phase of our launch, similar to what we did with the RHA filler line. And so I think for the balance of this year likely and post approval, we're going to spend most of our time focusing on ensuring that we're going to get really good, reproducible outcomes that are consistent with our clinical trial data. And that commercial launch is likely to be much more of a 2022 phenomenon.
>
> So that's how we're thinking about it, but there will be this stub period post approval, where we are going to need to spend some time with a select group of customers, getting real low commercial experience before going through a more traditional launch.

Revance, Q2 2021 Earnings Call, 7-8 (Aug. 5, 2021) (S&P Global, Inc. transcript).

157. In response to additional analyst questions during the August 5, 2021 earnings call about the BLA's status and DAXI manufacturing, Defendant Foley stated, in relevant part:

[Analyst]: Maybe just one follow-up, Mark, on the DAXI manufacturing side. In the past, I think you've noted about a 6- to 10-week time line for a turnaround from the agency. Just wondering if that's still your expectation. And then obviously, a strong quarter for the filler side here. So -- and obviously, breadth contributed, but just wondering what you're seeing from the reorder side of things.

[Foley]: Yes. So first off, we intentionally didn't give sort of a set time frame because we're outside of the PDUFA clock, where within the PDUFA framework, everything is moving towards the deadline. It's hard to know exactly the time frame that the agency is going to work under as it relates to the inspection. Clearly, they're trying their best, I think, to resolve any of these outstanding issues. ***And so we continue to pick our commentary that we're focused on an approval certainly before the end of 2021, and have full preparation and build schedule going on in the interim***. . . .

* * *

[Analyst]: Just a little bit more on the commercial preparations you're doing ahead of the approval. What are you able to do? You've obviously penetrated a decent amount of accounts. Is there anything that you can do outside of potential training and education such as commercial work, contracting work, preliminary contracting, preliminary negotiation? Is there any of that stuff that can happen ahead of time that could potentially smooth the process for the launch and not pull away too much of the energy from the filler momentum that you're having? And then on the manufacturing side, I realize that you said that this is a process. And so I imagine that means that there's a bit of a back and forth, if there are any issues that do come up, would you be telegraphing any of that? Or is this just -- you're keeping it as part of the process and you're still on board for second half, and that's about what you're going to say.

[Foley]: So first on the commercial prep, obviously, in the absence of approval, there's not much that we can do from a promotional standpoint or anything until we have approval. So when we talk about commercial prep, it's all around -- we continue to refine our pricing strategy and more market research work that we've been doing. I think that we've taken advantage of this gap between the launch of the filler and the expected approval of neuromodulator to build further relationships with physicians at the customer level. So we're continuing to establish the prestige Revance for aesthetics brand. I think people see us now as a company that's working towards a broader range of products, both from a services and a product stage.

And then obviously, we talked about building inventory in advance of launch. So one of the launch preps is internal activities, getting all our sales materials ready and everything to support that. So that's kind of more of what we're doing on the commercial prep side. On the manufacturing side, we kind of broke protocol in commenting on where we were in our FDA journey, given the pandemic when we talked about the fact that inspection had not been scheduled prior to the PDUFA. And then again, putting out a press release that one had been scheduled for the end of June. ***So I wouldn't read into my commentary about process. This is sort of a <u>standard piece</u> that needs to happen before approval. So the next communication you'll hear from us is kind of once we get the decision. But again, come back to the fact that we feel very good about our prep and where we were in that process and we continue all of our preparations in the hopeful approval of the product.***

Revance, Q2 2021 Earnings Call, 8-9 (Aug. 5, 2021) (S&P Global, Inc. transcript).

158. The statements in ¶¶155-57 were materially false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, and Schilke omitted the following facts:

(a) Defendants had received a Form 483 identifying five significant objectionable conditions on July 2, 2021;

(b) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted; and

(c) These omissions rendered the statements concerning the status of the DAXI BLA, the pre-approval inspection, and the timing of approval misleading to a reasonable person reading the statements fairly and in context.

159. On September 9, 2021, Revance attended the Wells Fargo Securities 2021 Virtual Healthcare Conference. Foley and Schilke were in attendance. During the conference, Defendant Foley made no mention of the Form 483 the Company received over a month prior, stating, in relevant part:

> ***Obviously, the most notable thing that we're waiting on is the approval of our neuromodulator.*** I'm sure we'll get into that a little bit more in the Q&A. ***But we feel really good about where we are in that process. The last thing that had to be completed as part of our approval was the on-site inspection, which did happen at the end of [ Q2 ].*** We're now within -- in sort of a holding pattern or waiting game until we get final news from the agency on that.

Revance, Presents at Wells Fargo 2021 Virtual Healthcare Conference, 4-5 (Sep. 9, 2021) (S&P Global, Inc. transcript).

160. The statements in ¶159 were materially false and/or misleading because Revance and Foley knowingly and/or recklessly made the statements while Revance, Foley, and Schilke omitted the following facts:

(a) Defendants had received a Form 483 identifying five significant objectionable conditions on July 2, 2021;

(b) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted; and

(c) These omissions rendered the statements concerning the status of the DAXI BLA and the pre-approval inspection misleading to a reasonable person reading the statements fairly and in context.

161. During that same conference, Defendant Foley responded to an analyst's question on the launch timing, stating, in relevant part:

> [Analyst]: Okay. Perfect. I appreciate that intro. Well, why don't we get the first out of the way, which, of course, on everyone's mind is the BLA that's in front of the FDA. Thank you for confirming on the inspection that was supposed to happen at the end of Q2. And you didn't provide this timetable, but I think you were speaking more generally around a 6- to 10 weeks time frame. And you anticipate getting a decision in the second half of '21. But is there any further update on this front? Has there been any additional dialogue with FDA about when this could occur?
>
> [Foley]: Yes, great question. So as you referenced, we did have the FDA at our facility end of Q2, as we indicated. A typical inspection is 1 to 2 weeks of sort of on-site inspection activities. ***Ours was a very typical inspection***. And as you pointed out, we did reference sort of this 6- to 10-week time frame post inspection as being what is normal and traditional within the PDUFA process, right? So the challenge that we've got here is we're outside of the normal PDUFA process.
>
> Again, our approval got delayed because the FDA was not able to physically travel to visit our site. And so we were in a holding pattern until they scheduled it for the end of Q2. So that's sort of the normal timing. We don't know in this current environment, whether or not that time frame is going to apply to us or whether or not it will be different. This is the division as well that is overseeing vaccines. So I'm sure there's some other competing priorities.
>
> From a planning standpoint, we continue to actively prepare for approval. We ***continue building inventory. We've got our launch strategy and everything in place. And so we're ready to flip the switch as soon as we receive notice from the agency. So nothing really incremental that we have from them in terms of timing***. We're just -- we're sort of just waiting.

Revance, Presents at Wells Fargo 2021 Virtual Healthcare Conference, 6 (Sep. 9, 2021) (S&P Global, Inc. Transcript).

162. The Form 483 issued by the FDA listed five categories of significant observations each of which was a basis to deny the BLA. The first two would require a new manufacturing process and delay approval for DAXI by almost two years past the company's original projections.

163. Additionally, the statements referenced in ¶161 were materially misleading because Revance, Foley, and Schilke omitted the following facts:

(a) Defendants had received a Form 483 identifying five significant objectionable conditions on July 2, 2021;

(b) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted;

(c) Accordingly, Revance's inspection was not "very typical";

(d) These omissions rendered the statements concerning the status of the DAXI BLA, the preapproval inspection, and the building of inventory misleading to a reasonable person reading the statements fairly and in context.

164. When the Form 483 was revealed to the market on October 11, 2021, Revance's stock price fell $6.85 per share, or 25%, to close at $20.45 per share on October 12, 2021.

### C. Defendants Continue to Mislead The Market About The Likelihood of Approval

165. On October 12, 2021, Revance issued a press release entitled, "Revance Continues to Anticipate FDA Approval of DaxibotulinumtoxinA for Injection for the Treatment of Glabellar Lines in 2021." The press release stated, in relevant part:

> [Revance] responds to the public disclosure of its Form 483 pursuant to a Freedom of Information Act (FOIA) request that was directed to the FDA. The

> Biologics License Application (BLA) for DaxibotulinumtoxinA for Injection remains under FDA review ***and the company continues to anticipate FDA approval of DaxibotulinumtoxinA for Injection for the treatment of glabellar lines in 2021.***
>
> Revance notes that the issuance of a Form 483 following the conclusion of an on-site inspection is not uncommon. A Form 483 lists observations made by FDA representatives during the inspection of a facility. A Form 483 does not constitute a final agency determination.
>
> Revance provided its response to the Form 483 in July 2021 following a pre-approval inspection and is currently awaiting the FDA's decision on its BLA for DaxibotulinumtoxinA for Injection for the treatment of glabellar lines. ***The company remains confident in the quality of its BLA submission and continues to anticipate FDA approval in 2021***.

Revance, Press Release, *Revance Continues to Anticipate FDA Approval of DaxibotulinumtoxinA for Injection for the Treatment of Glabellar Lines in 2021* (Oct. 12, 2021).

166. The statements in ¶165 above were materially false and/or misleading because Revance knowingly and/or recklessly made the statements while omitting the following facts:

(a) The problems identified in the Form 483, particularly Observations 1 and 2 regarding the Working Cell Bank and changed manufacturing process materially decreased the likelihood that the BLA would be approved by the FDA as submitted; and

(b) The Working Cell Bank was not projected to be qualified until December 31, 2021;

(c) These omissions rendered the statements concerning the likelihood of approval in 2021 misleading to a reasonable person reading the statements fairly and in context.

167. At no point during the Class Period did Defendants correct or update the aforementioned false and/or misleading statements listed in ¶¶115-62.

## III. THE FDA DENIES REVANCE'S BLA

168. Then, on October 15, 2021, Revance issued a press release entitled, "Revance Provides Regulatory Update on DaxibotulinumtoxinA for Injection for the Treatment of Moderate to Severe Glabellar (Frown) Lines." The press release stated, in relevant part:

> [Revance] today announced that the United States (U.S.) Food and Drug Administration (FDA) has issued a Complete Response Letter, or CRL, regarding the Biologics License Application (BLA) for DaxibotulinumtoxinA for Injection, for the treatment of moderate to severe glabellar (frown) lines.
>
> In a communication received on October 15, the FDA has determined it is unable to approve the BLA in its present form, and indicated that there are deficiencies related to the FDA's onsite inspection at Revance's manufacturing facility. Revance plans to request a Type A meeting with the FDA as soon as possible to address the deficiencies raised. No other deficiencies were identified in the CRL.
>
> "We are very disappointed by this unanticipated response from the FDA and are seeking further clarity from the agency. We remain committed to bringing our next-generation neuromodulator product to market in both aesthetic and therapeutic indications," said Mark Foley, President and Chief Executive Officer

169. On this news, Revance's stock price fell $8.90 per share, or 39.19%, to close at $13.81 per share on October 18, 2021.

170. After Revance disclosed that it had received a Complete Response Letter ("CRL") from the FDA on October 15, 2021, some market analysts expressed shock at the news given the Company's prior representations. For example, industry publication *Seeking Alpha* published an article on October 29, 2021, juxtaposing the Company's optimistic statements in its August earnings call with the Company's receipt of the CRL. *See* Robert Falcone, *Revance Therapeutics: Repricing Shares After A CRL*, Seeking Alpha (Oct. 29, 2021) https://seekingalpha.com/article/4463615-revance-therapeutics-repricing-shares-after-crl. Specifically, the article quoted Defendant Foley's representation during the August earnings call that Revance had taken advantage of pandemic delays "to keep up sort of our readiness for the inspection and continue to advance our commercial preparation plans." *Id*. Comparing those statements with later developments, the article called "[t]he sequence of events baffling to say

the least." *Id*. Critically, the article noted that Revance appeared to be aware of the manufacturing issues outlined by the FDA in advance of the FDA's pre-approval inspection. *Id.*

171. An analyst from Guggenheim reported that after speaking with external FDA manufacturing consultants, in ***the best case scenario***, it would take three months "to complete comprehensive analytical testing and qualify a new cell bank," but "typically" the FDA "wants to see 6 months of stability data, potentially bumping out the timeline to a late 2022/early 2023 PDUFA date." Guggenhiem, *RVNC: A Wrinkle in Time(lines); Our Consultants Lay Out an ~ 12 (Base Case) – 24-Month (Worse Case) Resolution to Approval . . . Lowering PT to $32* (Oct. 21, 2021). As the Establishment Inspection Report shows, qualification of Revance's Working Cell Bank was not projected to be complete until December 31, 2021. Ex. B at 22.

172. Following the FDA's determination that it was unable to approve Revance's BLA for DaxibotulinumtoxinA, Revance expressed its plan to request a "Type A" meeting with the FDA, which is a meeting that is "[i]mmediately necessary for an otherwise stalled drug development program to proceed." Revance, Press Release, *Revance Reports Third Quarter 2021 Financial Results, Provides Corporate Update* (Nov. 9, 2021); FDA, *Engaging with the FDA During New Drug Development*, https://www.accessdata.fda.gov/cder/sb-navigate/topic3/topic3/da_01_03_0090.htm#:~:text=Type%20A%20Meetings&text=Immediately%20necessary%20for%20an%20otherwise,Appeals%20Above%20the%20Division%20Level.

173. On December 15, 2021, a Type A meeting was held between the FDA and Revance. *See* Press Release, *Revance Receives Clarity on Path to Resubmission of the BLA for DaxibotulinumtoxinA for Injection Following Type A Meeting with FDA* (Jan. 18, 2022); Q4 2021 Earnings Call, Feb. 28, 2022, at 5. Revance announced after the meeting that "a complete response to address the outstanding observations related to the WCB and the drug substance manufacturing process will require Revance to qualify its new WCB by producing three consecutive drug substance lots and one drug product lot." *See* Press Release, *Revance Receives Clarity on Path to Resubmission of the BLA for DaxibotulinumtoxinA for Injection Following Type A Meeting with FDA* (Jan. 18, 2022).

174. As a result of the Type A meeting, and as Foley stated in the Q4 2021 Earnings Call:

> As we've indicated previously, and based on our Type A meeting, a ***reinspection of our manufacturing facility will be necessary*** once our resubmission is accepted by the agency. Further, based on FDA regulations, once the resubmission is accepted, ***the agency has up to 6 months to complete its reinspection of our facility, along with the review of our resubmitted BLA***.

Q4 2021 Earnings Call, Feb. 28, 2022, at 5 (emphasis added). *See also* Q4 2021 Earnings Call, Feb. 28, 2022, at 8 ("And in that Type A meeting, coming out of that, what the FDA wanted to see was the qualification of the new working cell bank with 3 consecutive drug substance and 1 drug product lot. So that's what we've been working on providing.").

175. On March 8, 2022, following its "completion of the production of three consecutive drug substance lots and one drug product lot as part of the qualification of a new working cell bank (WCB)," Revance provided the FDA with its BLA resubmission. *See* Press Release, *Revance Resubmits Biologics License Application for DaxibotulinumtoxinA for Injection for Galbellar Lines to the FDA* (Mar. 8, 2022).

176. When a BLA is resubmitted to the FDA, it can be given one of two designations: Class 1 or Class 2. FDA, *Classifying Resubmissions of Original NDAs, BLAs, and Efficacy Supplements in Response to Complete Response Letters*, Manual Of Policies and Procedures, Center For Drug Evaluation And Research, MAPP 6020.4 Rev. 2, at 1 https://www.fda.gov/files/about%20fda/published/Classifying-Resubmissions-of-Original-NDAs--BLAs--and-Efficacy-Supplements-in-Response-to-Action-Letters.pdf. A resubmission's classification "is based on the information submitted by the applicant in response to an action letter." *Id.* at 1. A Class 1 resubmission has a review period of 2 months, while a Class 2 resubmission has a review period of 6 months. *Id.* at 2. Resubmissions that require a reinspection of an applicant's manufacturing facilities fall into Class 2. *Id.* at 4.

177. On April 21, 2022, Revance received FDA acceptance of its BLA Resubmission for DaxibotulinumtoxinA. Revance, Press Release, *Revance Receives FDA Acceptance of BLA*

*Resubmission for DaxibotulinumtoxinA for Injection for Glabellar Lines* (Apr. 21, 2022). In accepting Revance's resubmission, "[t]he FDA designated the BLA as a Class 2 resubmission, which has a six-month review period and includes a required reinspection of the company's manufacturing facility." *Id*;*see also* Revance, Q1 2022 Earnings Call, 14 (May 10, 2022) (S&P Global transcript).

178. The FDA's designation of this resubmission as Class 2 and the necessity of a reinspection further confirmed how far from ready Revance's manufacturing was.

On July 15th, the FDA provided Revance with ***another*** Form 483 that contained another three observations. *See Revance Reports Second Quarter 2022 Financial Results, Provides Corporate Update* (Aug. 9, 2022).

179. In line with the FDA's Class 2 designation of Revance's resubmission, it was not until September 8, 2022, nearly six months after the FDA accepted Revance's BLA resubmission for DaxibotulinumtoxinA, that the FDA approved the drug "for injection for the temporary improvement of moderate to severe frown lines (glabellar lines) in adults." Revance Press Release, *Revance Announces FDA Approval of DAXXIFY™ (DaxibotulinumtoxinA-lanm) for Injection, the First and Only Peptide-Formulated Neuromodulator With Long-Lasting Results* (Sept. 8, 2022). It took nearly one year from October 15, 2021, the date the FDA determined that it was unable to approve Revance's BLA for DaxibotulinumtoxinA – during which time a "Type A" meeting between Revance and the FDA was held, Revance resubmitted DaxibotulinumtoxinA to the FDA for approval (which the FDA classified as a Class 2 resubmission), and the FDA inspected Revance's manufacturing facility over the course of several days, revealing several additional observations – before the drug was finally approved.

## IV. ADDITIONAL SCIENTER ALLEGATIONS

### A. *Respondeat Superior*

180. Revance is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the

scope of their employment or agency with the authority or apparent authority to do so. The scienter of Defendants and other Company officers, directors, employees, and agents is similarly imputed to Teva under *respondeat superior* and agency principles.

**B. Defendants Had Access To And Possession Of Material Adverse Facts**

181. Defendants had access to and were in possession of adverse material facts regarding the ability of Revance's manufacturing facilities to withstand a pre-approval inspection. These facts include, for example, the contents of Revance's BLA, conversations with the FDA concerning the manufacturing issues during the preapproval inspection, and the Form 483 itself.

182. Defendants knew or were deliberately reckless in not knowing the FDA regulations pertaining to BLAs because they frequently discussed the BLA and Revance's readiness for the pre-approval inspection. *See, e.g.*, ¶¶115-62, *supra.*

183. Defendant Joshi was hired by Revance in 2015 to serve as Revance's Chief Operating Officer ("COO"). *See* Revance, Press Release, *Revance Appoints Abhay Joshi, PhD, as Chief Operating Officer* (December 14, 2015). According to then-CEO Dan Browne, Dr. Joshi's roles was to direct Revance's R&D and pre-commercial operations. *Id.*

184. In January 2020, just after the start of the Class Period, Dr. Joshi was promoted to President of R&D and Product Operations. *See* Revance, Q4 2019 Earnings Call, 5 (Feb. 24, 2020). According to Revance's proxy filings, Dr. Joshi was responsible for management and leadership of clinical development, regulatory and manufacturing, steering committees for partner collaborations, and the filing of Revance's BLA. *See* Revance, Proxy Statement (Schedule 14A), 36 (filed Mar. 26, 2020); Revance, Proxy Statement (Schedule 14A), 45 (Mar. 24, 2021); Revance, Proxy Statement (Schedule 14A), 42 (Mar. 24, 2022).

185. In this capacity, Joshi necessarily had access to and possession of all of the issues that the FDA would eventually identify during the pre-approval inspection, as well as the fact that those issues materially decreased the likelihood of approval in the BLA as submitted and in the timeframes the Company represented to investors.

186. Joshi was present at Revance's manufacturing facility during the pre-approval inspection. *See* Ex. A at 1; Ex. B at 1-12. The FDA described Joshi as the "most responsible person onsite" at the facility. Ex. B at 10. Additionally, Defendant Joshi was present at the close-out meeting with the FDA, during which each observation in the Form 483 was read aloud. Ex. B at 52-53. Thus, Defendant Joshi knew what problems the FDA identified during the inspection.

187. Defendant Joshi also had access to and possession of the Form 483, as the FDA provided it to him at the end of the inspection, on July 2, 2021. *See* Ex. B at 5. Joshi reports to Foley. Ex. B at 10.

188. Defendants Foley's and Schilke's statements before and during the Class Period evidenced a strong familiarity with the BLA, Daxi's manufacturing, and the preparations for and conduct of the pre-approval inspection. For example, shortly before the BLA was filed, Shilke stated during the Credit Suisse 28th Annual Healthcare Conference:

> And most important to really note is our U.S.-based manufacturing process. Again, we're manufacturing botulinum toxin. This is inspected on an annual basis by the CDC under the U.S. select agents.
>
> So we undergo rigorous annual inspections for our manufacturing plant, which gives us confidence that we'll be able to go through our prior approval inspections for our DAXI approval for the BLA.
>
> Given sort of the nature and the scrutiny that we have on making such a toxic molecule that the CBC, we have very detailed inspections with them.
>
> So again, that facility not only makes the drug substance but is also able to make the drug product. So we're able to scale from that facility. And then we have -- as we continue to build out, we have already a relationship with another party to allow us to scale the business as we continue to scale commercially from a drug product manufacturing perspective.

Revance, Company Conference Presentation, 8 (Nov. 13, 2019) (S&P Global transcript). *See also* ¶¶134, 144, 146, *supra* (Foley's statements about the status of the BLA, the manufacturing status, and the pre-approval inspection).

189. Confidential Witness 1 ("CW 1") served as an Executive Assistant at Revance from September 2019 to September 2021. CW 1 served in that capacity for Chief Commercial

Officer Dustin Sjuts and, for a short time, Foley. As their Executive Assistant, CW 1 coordinated their calendars. According to CW 1, Foley, Schilke, Joshi, and other C-Level executives had meetings at least once a week during this time. Some of these meetings concerned preparations for the FDA inspection. CW 1 said that at some point during the period from September 2019 to September 2021, Azita Nejad ("Nejad") joined the weekly meetings.

190. Nejad served as Senior Vice President of Technical Operations for Revance and was present during the pre-approval inspection. Ex. B at 9. She reports directly to Joshi. *Id.* at 12.

191. The Form 483 and EIR confirm that Defendants had access to and were in possession of the fact that Revance was not ready for commercialization. For one thing, Defendants had access to and were in possession of the fact that Revance's Working Cell Bank (or WCB) was ineffective—the subject of the Form 483's first observation. This was discovered after drug substance lots manufactured in August and September 2020 failed, which meant that the Company had not been able to manufacture a "commercial batch" of drug substance since September 6, 2019. Ex. B at 23, 50. Revance conducted a quality investigation in September 2020 and recommended CAPA (corrective action and preventative action) in May 2021 to manufacture and qualify a new WCB. *See* Ex. A at 1; Ex. B at 5, 7-8, 53-54. The CAPA was not approved until June 15, 2021 ***and was still not completed as of the pre-approval inspection***. Ex. A at 1; Ex. B at 5. In fact, Revance's "projected timeline" for the qualification of the WCB was December 31, 2021—nearly six months after the pre-approval inspection. *See* Ex. B at 22. Such an important issues would necessarily have been discussed during the weekly meetings described above.

192. Defendants also had access to and were in possession of the fact that the changes in the manufacturing process necessitated by the CAPA were different from the process proposed in the BLA—the subject of the Form 483's second observation—because they necessarily had possession of their own BLA and the new process Revance initiated. *See* Ex. A at 1; Ex. B at 5.

193. Additionally, Defendants had access to and were in possession of the content of conversations the “firm[’]s management” had with the FDA during the inspection. Ex. B at 5. Significantly, the EIR Summary’s records of these conversations reveal that the manufacturing deficiencies necessitating the manufacturing process changes were “***identified since 2020***,” and that the FDA inspector explained that “the firm’s assumption” that the changes made were consistent with the BLA was an “incorrect” one. Ex. B at 5, 8-9, 12, 52-53.

194. Defendants also had access to and were in possession of the facts relevant to the Form 483’s third observation. Namely, that, at all relevant times, they did not have a Quality Agreement in place for a testing facility that Revance leased since in 2015, and did not include that site in Revance’s BLA. *See* Ex. A at 2; Ex. B at 5.

195. Defendants also had access to and were in possession of Revance’s own yield calculations and Master Batch Record, which were the subject of observations four and five of the Form 483. *See* Ex. A at 2-3, Ex. B at 5.

196. Defendants also had access to or were in possession of the fact that the foregoing issues would cause problems because, in addition to their knowledge of the relevant FDA regulations, they hired “outside consultants and experts to do mock audits to pressure test [Revance’s] systems” to help them prepare for the pre-approval inspection. *See* Revance, Q2 2021 Earnings Call, 9 (May 10, 2021) (S&P Global, Inc. transcript). Specifically, during theh Q2 2021 Earnings Call, Foley stated that Revance had been using the “downtime” afforded to it by the FDA’s delay in conducting inspections to be even further prepared for the pre-approval inspection:

> [Analyst]: . . . And then wondering on the inspection, you've had a little bit of time now, more time to prepare. Just can you talk about what you've done behind the scenes? Are you having consultants do mock walk-throughs? Is there any kind of corrective action you've been able to take just to really make sure that we nail it the first time around?
>
> [Foley]: . . . ***On the overall preparation side of it, absolutely. Our team has done a great job of taking sort of advantage of this downtime where we have been engaged with outside consultants and experts to do mock audits to pressure test our systems. And we are actively building inventory in preparation for our launch. So things are changing there. We've actually trained our sales force as***

> ***well. And so we continue to be leaning in, and we'll certainly be ready once approval comes.***

*Id*.

197. Considering that Foley mentioned this on the May 10, 2021 call, and that the Company was necessarily aware of the problems with the WCB by then, it is highly likely that the outside consultants and experts brought these issues to Nejad's and/or Joshi's attention, and that Joshi and/or Nejad brought these issues to Foley's and Schilke's attention during the weekly meetings.

198. Defendants had access to and were in possession of the information contained in the Form 483 because the FDA inspectors provided it to Joshi, *see* Ex. A at 1, and FDA regulations provide that a copy must also be sent to the firm's "top management." *See* FDA, Inspections and Operations Manual (2022), § 5.2.3, at 5-20, 5-26, https://www.fda.gov/media/113432/download (last visited Nov. 4, 2022) (providing that Form 483s "should be issued to the most responsible person available at the close of the inspection[,]" with a copy to the "top management of the firm.") ; *see also* 21 C.F.R. § 211.180 ("Procedures shall be established to assure that responsible officials of the firm, if they are not personally involved in or immediately aware of such actions, are notified in writing of any . . . reports of inspectional observations issued by the Food and Drug Administration . . . "). Foley was described by the FDA as "the most responsible person for the firm." Ex. B at 10. Thus, he would have received a copy of the Form 483 from the FDA and/or from Joshi, as Joshi is "responsible for overseeing site operations at the Newark, CA facility" where the inspection occurred and reports to Foley. *See* Ex. B at 10. As CFO, Schilke is also "top management" and would likely have been provided with the Form 483 by the FDA and/or Joshi and Foley.

### C. Core Operations

199. Because the fraud alleged herein relates to the core business of Revance, knowledge of the facts underlying the fraudulent scheme may be imputed to the Individual Defendants. Indeed, Revance repeatedly acknowledged the significance of DAXI as a core product, and its pending FDA approval as a pivotal moment for the company. Therefore, the

Individual Defendants, as senior level executives and/or directors, were in such positions at the company to access all material, non-public information concerning the ongoing manufacturing issues identified during the FDA's inspection, and the Form 483 itself.

200. Throughout the Class Period, Revance emphasized the importance of DAXI to its overall business. Indeed, in its SEC filings, Revance acknowledged that DAXI is its "lead product candidate" and that "we are substantially dependent on the clinical and commercial success of our product candidate DAXI." *See, e.g.*, Revance, Annual Report (Form 10-K), 1, 22 (filed Feb. 26, 2020); *see also* Revance, Annual Report (Form 10-K), 31 (filed Feb. 25, 2021).

201. In Revance's press release announcing its submission of the DAXI BLA to the FDA, Defendant Foley stated, "[t]he submission of our BLA represents a significant milestone in the Company's history . . . Revance enters a catalyst-rich calendar year of significant clinical trial readouts and meaningful Company milestones, which we believe will culminate in the approval and launch of DAXI..." acknowledging at the outset that the success of DAXI had wide ranging implications for the Company. *See* Press Release, *Revance Submits Biologics License Application (BLA) to the FDA for DAXI to Treat Glabellar (Frown) Lines* (Nov. 25, 2019).

202. During an earnings call held on August 6, 2020, Foley referred to DAXI as "our lead asset" and touted DAXI as "the world's first true next-generation long-acting neuromodulator." Revance, Q2 2020 Earnings Call, at 5, 8 (Aug. 6, 2020) (S&P Global, Inc. transcript).

203. Although Revance marketed the RHA Fillers beginning in June 2020, it did so in partnership with another company. As the Company's own product, DAXI had the most earning potential for the Company by far. While presenting at the Morgan Stanley 18th Annual Global Healthcare Conference on September 14, 2020, Defendant Schilke stated that "[c]learly, over time, from our [DAXI], we seek to get to sort of industry norms from sort of a gross margin perspective. And you do that with scale as you kind of build your scale for [DAXI] and sort of build your scale for fillers. Clearly, the margins on [DAXI] will be greater than those on fillers, just simply because we're the innovator there and we control the manufacturing process for

[DAXI]." Revance, Presents at Morgan Stanley 18th Annual Global Healthcare Conference, at 8 (Sept. 14, 2020) (S&P Global, Inc. transcript transcript).

204. DAXI's importance to Revance is also made apparent by the amount of time the Company devoted to discussing it. DAXI and/or the status of its BLA approval is mentioned during every earnings call held during the Class Period. *See* Revance, Q4 2019 Earnings Call (Feb. 24, 2020) (S&P Global, Inc. transcript); Revance, Q1 2020 Earnings Call (May 7, 2020) (S&P Global, Inc. transcript); Revance, Q2 2020 Earnings Call (Aug. 6, 2020) (S&P Global, Inc. transcript); Revance, Q3 2020 Earnings Call (Nov. 9, 2020) (S&P Global, Inc. transcript); Revance, Q4 2020 Earnings Call (Feb. 22, 2021) (S&P Global, Inc. transcript); Revance, Q1 2021 Earnings Call (May 10, 2021) (S&P Global, Inc. transcript); Revance, Q2 2021 Earnings Call (Aug. 5, 2021) (S&P Global, Inc. transcript); Revance, Q3 2021 Earnings Call (Nov. 9, 2021) (S&P Global, Inc. transcript).

205. Foley continued to refer to DAXI as the Company's "lead product" during the Q2 2021 earnings call held on August 5, 2021. Revance, Q2 2021 Earnings Call, at 4 (Aug. 5, 2021) (S&P Global, Inc. transcript). On the same date, Revance issued a press release that stated that once DAXI was approved, they expected the product to "underpin our aesthetics franchise and set the standard for neuromodulator performance . . ." *See* Revance Reports Second Quarter 2021 Financial Results, Provides Corporate Update (Aug. 5, 2021).

206. Revance has consistently advertised DAXI as a core product, maintaining it as a top priority before, during, and after the class period. On an earnings call held on August 9, 2022, Foley stated that obtaining FDA approval of DAXI "***remains*** our top corporate priority for 2022" and referred to DAXI as "our flagship drug product." Revance, Q2 2022 Earnings Call, at 5 (Aug. 9, 2022) (S&P Global, Inc. transcript).

207. Revance has a relatively small number of employees. Revance began the class period with 193 employees in 2019. Revance 10-K at 21 (Feb. 26, 2020). That number grew to 470 during 2020, then to almost 500 by the end of 2021. Revance, Annual Report (Form 10-K), 26 (filed Feb. 25, 2021); Revance, Annual Report (Form 10-K), 29 (filed Feb. 28, 2022).

208. Accordingly, it is highly likely that the manufacturing issues that plagued the submission of the BLA during the Class Period, and even prior during the preparation of the BLA, would have been directly reported from the person responsible for manufacturing—Joshi—to the other Individual Defendants.

209. Thus, the Individual Defendants were aware, or recklessly disregarded, that their statements about the readiness of their manufacturing facility for inspection, and statements regarding an imminent approval of the DAXI BLA, made contemporaneously with knowledge of contradictory information, were materially false and/or misleading when made.

### D. Defendants' Financial Motive

#### 1. Equity Grants and Other Incentive Compensation

210. Although the Individual Defendants knew, or recklessly disregarded that there were manufacturing issues that would preclude approval of the BLA for DAXI, they were motivated to tout the pending approval of DAXI and represent its readiness for commercialization to the public to maximize the value of their lucrative performance-based executive compensation through inflation of Revance's share price.

211. According to Revance's SEC filings, the Company's executive compensation program included base salary, performance-based annual bonus, and performance-based incentive equity. *See* Revance, Proxy Statement (Schedule 14A), 28-29 (Mar. 26, 2020). In making executive compensation decisions, the Compensation Committee of Revance's Board of Directors considered the performance and skills of each Named Executive Officers ("NEO") in addition to compensation paid to NEOs at similar companies. *Id.* at 29. The details of the components of Revance's executive compensation program during the Class Period are as follows:

a. Base Salary (fixed cash): Base salaries are generally reviewed annually and determined based on a number of factors such as individual performance, internal equity, retention, expected cost of living increases, and overall Company

performance. *Id.* Additionally, market data provided by an independent compensation consultant was taken into account. *Id.*

b. Performance Bonus (at-risk cash): The Company believes that performance bonuses motivate and reward NEOs for attaining annual corporate performance goals. *Id.* Target bonus amounts, which are calculated as a percentage of each NEO's base salary, were reviewed annually and are "dependent on achievement of specific corporate performance goals established at the beginning of the year, and except with respect to [the] CEO, individual performance objectives that relate to the NEOs' role and expected contribution to reaching [Revance's] corporate goals." *Id.* Throughout the Class Period, one of the key corporate goals was the achievement of milestones and activities related to the BLA for DAXI and its subsequent commercialization. *Id*. at 35; *see also* Revance, Proxy Statement Schedule 14A), 44 (filed Mar. 24, 2021); Revance, Proxy Statement (Schedule 14A), 41 (filed Mar. 24, 2022).

c. Long-Term Incentive (at-risk equity): According to the Company, the objective of Long-Term Incentives is to motivate and reward for long-term Company performance. *See* Revance, Proxy Statement (Schedule 14A), 29 (filed Mar. 26, 2020). The Company generally reviewed and determined equity opportunities on an annual basis. *Id.* Individual grants of equity are based on "a number of factors including current corporate and individual performance, outstanding equity holdings and their retention value and total ownership, historical value of [Revance] stock, internal equity amongst executives and market data provided by [Revance's] independent compensation consultant." *Id*. Historically, the Company granted equity primarily in the form of stock options and Restricted Stock Awards ("RSA"). *Id*. After Defendant Foley was hired in late 2019, the Company introduced Performance Stock Awards ("PSA"). *Id.* The Company granted PSAs to other NEOs in 2020. *Id.* Crucially, the award of PSAs to NEOs

vests according to a schedule encompassing three corporate milestones: "(1) 25% of the PSA vest on the earlier of the following events, if such event occurs on or before December 31, 2020: (a) FDA approval of the Company's BLA for DAXI for the treatment of glabellar lines; or (b) change in control (as defined in the Equity Plan); (2) 35% of the PSA will vest upon the earlier of the following, as confirmed by the Board of the Compensation Committee on or before October 13, 2029: (a) the date that the closing share price of our common stock is at least $25 per share (representing more than a 100% increase in closing share price as compared to the closing share price on the grant date) and remains at or above $25 per share during any 90 consecutive trading-day period on a volume weighted average price (VWAP) basis; or (b) upon a change in control (as defined in the Equity Plan) in which the purchase of our common stock is at or above $40 per share; (3) 40% of the PSA will vest upon the earlier of the following, as confirmed by the Board of the Compensation Committee on or before October 13, 2029: (a) the date that the closing share price of our common stock is at least $40 per share (representing more than a 200% increase in closing share price as compared to the closing share price on the grant date) and remains at or above $40 per share during any 90 consecutive trading-day period on a volume weighted average price (VWAP) basis; or (b) upon a change in control (as defined in the Equity Plan) in which the purchase of our common stock is at or above $40 per share." *Id.* at 38; *see also* Revance, Proxy Statement (Schedule 14A), 47-48 (filed Mar. 24, 2021).

212. As reflected in Revance's SEC filings, Foley, Schilke, and Joshi were motivated to conceal the truth by their executive compensation packages. For example, the chart below shows Foley's and Schilke's executive compensation for 2019 through 2021:

| Name | Year | Salary | Bonus | Stock Awards | Option Awards | Other Comp. | Total |
|---|---|---|---|---|---|---|---|
| Foley | 2019 | $189,764 | $150,000 | $11,728,37 | $5,112,573 | $9,723 | $17,190,430 |
| | 2020 | $650,000 | $328,331 | $7,794,350 | $0 | $8,255 | $8,780,936 |
| | 2021 | $660,000 | $425,700 | $4,561,652 | $1,141,226 | $317,338 | $7,105,916 |
| Schilke | 2019 | $407,126 | $203,123 | $86,150 | $299,781 | $11,078 | $1,007,258 |
| | 2020 | $421,375 | $143,186 | $1,131,345 | $1,273,662 | $11,531 | $2,981,099 |
| | 2021 | $429,802 | $192,336 | $1,267,172 | $634,014 | $11,470 | $2,534,794 |

*See* Revance, Proxy Statement (Schedule 14A), 52 (Mar. 24, 2021); Revance, Proxy Statement (Schedule 14A), 49 (Mar. 24, 2022).

213. As illustrated above, most of the Individual Defendants' compensation came in the form of stock and options, providing ample motive to keep the Company's share price inflated during the class period.

**a. Revance's Bonus and Equity Incentive Programs Caused the Individual Defendants To Be Aware of the Progress of the FDA Regulatory Process for DAXI**

214. Given that 45% of the Individual Defendants' target bonuses during the Class Period were tied to regulatory approval of DAXI, the Individual Defendants were self-interested in the progress of the FDA approval process for DAXI, including the status of the FDA's pre-approval inspection of Revance's manufacturing facility. *See* Revance, Proxy Statement (Schedule 14A), 43 (filed Mar. 24, 2022) at 43 (providing that 45% of the Individual Defendants' cash bonuses are tied to DAXI's approval). This was despite the Board's decision to extend eligibility for this bonus into 2021 from 2020. *Id*.

215. The Individual Defendants' personal stake in Revance's successful completion of the pre-approval inspection certainly would have caused them to monitor the preparations for such inspection, and to be aware of any issues which eventually resulted in the FDA's issuance of a Form 483 in July 2021, putting their bonuses and personal compensation in jeopardy.

216. Additionally, with respect to Revance's grant of PSAs to the Individual Defendants, the vesting of 25% of those equity awards was directly tied to regulatory approval of DAXI. *See* Revance Proxy Statement (Schedule 14A), 38 (filed Mar. 26, 2020); *see also* Revance, Proxy Statement (Schedule DEF 14A), 47-48 (filed Mar. 24, 2021).. This vesting

requirement provides even further evidence that the Individual Defendants would have closely monitored the regulatory approval process including the FDA's pre-approval inspection and the Company's preparations for such inspection.

**b. Revance's Equity Incentive Grants Incentivized the Individual Defendants to Artificially Inflate the Company's Share Price**

217. Revance's equity compensation program constituted a large portion of the Individual Defendants' annual compensation, causing the Individual Defendants to be highly motivated to increase the value of the Company's common stock during the Class Period. As the Company itself admitted, the equity incentives motivate and reward executives for long-term Company performance. *See* Revance, Proxy Statement (Schedule DEF 14A), 29 (filed Mar. 26, 2020). This is especially true given Revance's emphasis on PSAs, the vesting of large portions of which are directly tied to defined increases in Company share price. *Id*. at 38; *see also* Revance, Proxy Statement (Schedule 14A), 47-48 (filed Mar. 24, 2021).. Therefore, the Individual Defendants were motivated to artificially inflate the price of Revance stock during the Class Period by misrepresenting the Company's readiness for regulatory approval of DAXI, and specifically the Company's readiness for a pre-approval inspection, when in fact, there were significant issues at the Company's manufacturing facility that ultimately led to the FDA's issuance of a Form 483 and resulting in the FDA's inability to approve DAXI in 2021.

**2. Revance's Motive**

218. During the Class Period, Defendants were further motivated to artificially inflate Revance's stock price because doing so allowed Revance to continue to fund its operations, including development and commercialization of DAXI.

219. In early 2019, Revance's primary sources of income were through collaboration and license agreements with third party companies. *See* Revance Quarterly Report (Form 10-Q), 9 (filed May 9, 2019); Revance, Annual Report (Form 10-K), F-16 (filed Feb. 26, 2020). In February 2018, Revance entered into the Botox biosimilar collaboration and license agreement with Mylan, which included an upfront payment of $25 million and subsequent incremental

payments which constituted the bulk of Revance's revenue throughout 2019. *See* Revance, Annual Report (Form 10-K), 47 (filed Feb. 26, 2020). In January 2019, in connection with a License Agreement with Fosun that it executed in December 2018, Revance received from Fosun an upfront payment of $30.0 million. *See* Revance, Annual Report (Form 10-K), F-18 (filed Feb. 26, 2020); Revance, Quarterly Report (Form 10-Q), 10 (filed Nov. 4, 2019); Revance, Annual Report (Form 10-K), 66 (filed Feb. 26, 2020). In August 2019, Revance entered into the Amended agreement with Mylan, in order to continue the Botox biosimilar development program. *See* Revance, Annual Report (Form 10-K), 69 (filed Feb. 26, 2020). In its own SEC filing, Revance attributes "all of [its] revenue" to be from "Mylan under the Mylan Collaboration." *See id.* at 21.

220. This income was insufficient to fund Revance's operations. During the Class Period, Revance's operating costs were $164.872 million to $352.474 million annually, and it ran of deficit of $844 million to $1.4 billion during this time. *See* Revance, Annual Report (Form 10-K), 28, 34, 66, F-4, F-5, F-8 (filed Feb. 26, 2020); Revance, Annual Report (Form 10-K), 6, 44, F-5, F-6, F-9 (filed Feb. 25, 2021); Revance, Annual Report (Form 10-K), 34, 83, F-5, F-11 (filed Feb. 28, 2022).

221. As a result, the Company was depending on funding its operations through the sale and issuance of common stock. *See, e.g.,* Revance, Annual Report (Form 10-K) 29 (filed Feb. 26, 2020). For example, in its Quarterly filing for the first quarter of 2020, Revance stated that "[i]n recent years, we have funded our operations primarily through a combination of issuance and sale of common stock and issuance of convertible senior notes." *See* Revance, Quarterly Report (Form 10-Q), 7 (filed May 7, 2020).

222. Revance made substantially similar representations in its other quarterly filings that year. *See* Revance, Quarterly Report (Form 10-Q) 7 (Aug. 6, 2020); Revance, Quarterly Report (Form 10-Q) 7 (Nov. 9, 2020).

223. In reporting its full-year financial results in its 2020 Annual Report, Revance represented that "[w]e have funded our operations primarily through the sale and issuance of

common stock and the 2027 Notes." *See* Revance, Annual Report (Form 10-K), 44 (filed Feb. 25, 2021).

224. In May 2021, shortly before the pre-approval inspection, Revance filed a Quarterly Report on Form 10-Q that stated "[i]n recent years, we have funded our operations primarily through the sale of common stock, convertible senior notes, and payments received from collaboration arrangements." *See* Revance, Quarterly Report (Form 10-Q), 7 (filed May 10, 2021).

225. Revance reiterated this position in its August 2021 Quarterly Report. *See* Revance, Quarterly Report (Form 10-Q) 8 (Aug. 5, 2021).

226. Defendants' repeated representations about the importance of common stock to the funding of the Company's operations provides strong financial motive to artificially inflate Revance's stock price during the Class Period.

227. Further, Defendants were motived to artificially inflate Revance's stock price because it allowed the Company to obtain more cash through public and private securities offerings entered into prior to disclosure of problems with the Company's manufacturing facility.

228. For example, on December 4, 2019, Revance announced a public offering of 6,500,000 shares at $17.00 per share which closed on or about December 6, 2019, raising approximately $110.5 million. *See* Revance Current Report (Form 8-K), 1 (filed Dec. 4, 2019).

229. Defendants were motivated to artificially inflate Revance's stock so that they could use the funds obtained to commercialize DAXI. *See* Revance, Prospectus Supplement (Form 424B5), S-2 (filed Dec. 4, 2019) ("We intend to use the net proceeds from this offering to continue to fund the commercialization of DAXI, and the remainder for working capital, research and development and general corporate purposes.").

230. Then, on February 10, 2020, Revance announced a private placement of $200 million convertible senior notes due in 2027. *See* Revance, Current Report (Form 8-K), 1 (filed Feb. 10, 2020). The notes were convertible into cash, shares of Revance, or a combination of the two. *Id.* at Ex. 99.1.

231. Notably, Revance stated that the proceeds of the offering would go to supporting the development and commercialization of DAXI. *Id.* at Ex. 99.1.

232. The offering ultimately resulted in the issuance of $287.5 million in convertible senior notes. *See* Revance Current Report (Form 8-K) 1 (Feb. 14, 2020)

233. Given that the notes could be converted into either cash or Revance common stock, there was an incentive to keep the Company's stock price high in order to encourage exchange for Revance common stock at a lower cost to the Company than a cash payout.

234. Additionally, Defendants were motived to artificially inflate Revance's stock price in order to fund acquisitions that allowed the Company to fund its operations and expand its commercialization efforts.

235. For example, in January 2020, Revance announced that it had entered into a deal with Teoxane SA ("Teoxane") for the right to sell and distribute Teoxane's line of Resilient Hyaluronic Acid dermal fillers *See* Revance Current Report (Form 8-K), 1 (filed Jan. 10, 2020). Revance financed the deal with the exchange of 2,500,000 shares of Revance common stock. *Id.*

236. Proceeds from this distribution agreement would later come to fund a portion of Revance's operations. *See* Revance, Quarterly Report (Form 10-Q) 8 (filed Aug. 5, 2021) ("In recent years, we have funded our operations primarily through the sale of common stock, convertible senior notes, payments received from collaboration arrangements, and sales of the RHA® Collection of dermal fillers."); *see also* Revance, Annual Report (Form 10-K), 34 (filed Feb. 28, 2022) ("We have funded our operations primarily through the sale of common stock, convertible senior notes, payments received from collaboration arrangements, and sales of the Current RHA® Collection of dermal fillers.").

237. With respect to Revance's commercialization efforts, Revance's artificially inflated stock price allowed it to acquire Hint, Inc. ("Hint"), a private company which had created an integrated financial technology platform for the aesthetics industry. *See* Revance Press Release, *Revance Announces Agreement to Acquire HintMD and its Proprietary Fintech Platform for Aesthetic Practices* (May 19, 2020).. Revance's acquisition of Hint was completed

on an all-stock basis. *Id*. Revance announced that the acquisition of Hint would strengthen the Company's ability to grow its aesthetics business, a key component of which was DAXI. *Id*.

238. Revance's commercialization efforts were exceedingly important to the Company, as evidenced by warnings in its regulatory filings that failure to properly execute the Company's commercialization strategy could adversely impact the Company and its business. *See*, e.g., Revance, Annual Report (Form 10-K), 22-24 (filed Feb. 26, 2020).

239. Consequently, as evidenced in detail above, Defendants had a strong financial motive to keep Revance's stock price artificially inflated during the Class Period so that the Company could continue to fund its operations and acquisitions.

**E. Defendant's Experience and Education**

240. During the Class Period, Defendants were highly experienced in the pharmaceutical, healthcare, and biotechnology industries, and were therefore well aware that their statements regarding the likelihood of DAXI BLA obtaining FDA approval within the timeframe Revance had represented to investors were false and/or misleading and that material information had been omitted.

241. As set forth below, Defendants are sophisticated pharmaceutical executives who are well-versed in the customs and practices of the pharmaceutical industry. For example, Defendant Foley has more than twenty-five (25) years of experience in the healthcare industry. Foley has been the President and Chief Executive Officer of Revance since October 2019, and has been a Director at Revance since September 2017. Revance, Proxy Statement (Schedule 14A), 8 (filed Mar. 24, 2021). The Company explains Foley's director qualifications as follows: "Our Board believes that Mr. Foley's leadership experience, financial expertise, experience at multiple public pharmaceutical companies, and his expertise with the development and commercialization in the aesthetics, medical device, and biotechnology and financial technology industries make him qualified to serve on our Board." *See id.* at 8. His "key skills" include "manufacturing and supply chain." *See id.* at 7-8.

242. At the time Foley assumed the role of CEO, Revance's Chairman of the Board was quoted in a press release dated October 14, 2019, as saying that "Mark [Foley] is a seasoned aesthetic and medical device leader, having expertise in commercialization strategies that drive company growth and generate significant shareholder value." Revance, Press Release, *Revance Appoints Mark J. Foley as President and CEO, Replacing Dan Browne* (Oct. 14, 2019). Before Revance, Foley was the Chairman, President, and CEO of ZELTIQ Aesthetics, which manufactures medical devices, from April 2012 to April 2017. *See* Revance, Proxy Statement (Schedule 14A), 8 (filed Mar. 24, 2021). At ZELTIQUE, Foley led the company through a period of significant growth that culminated with Allergan acquiring ZELTIQ. Revance, Current Report (Form 8-K), Ex. 99.1 (filed Oct. 14, 2019). Before ZELTIQ, Foley held various senior operating roles in both large public companies and ventured-backed startups, such as Perclose, U.S. Surgical Corporation, Devices for Vascular Intervention, Guidant Corporation, and Ventrica, the latter of which he was the founder and CEO. *See* Revance, Proxy Statement (Schedule 14A), 8 (filed Mar. 24, 2021). Foley has served on the Board of Directors of SI-BONE, Inc., a medical device company, and currently serves as a Board of Director for Glaukos Corp., a medical technology and pharmaceutical company that focuses on treatments for eye conditions. *See id.* Foley has also served as the Co-Chair of the Aesthetics Innovation Summit since September 2017, has been a Board Member and Chairman of uLab since June 2015, and has served as Chairman of the Board of HintMD. *See* LinkedIn, *Mark Foley*, https://www.linkedin.com/in/mark-foley-1615995/; Aesthetics Innovation Summit, *Mark Foley*, https://attendais.com/mark-foley/; uLab Systems, *uLab Team*, https://www.ulabsystems.com/ulab-team/; HintMD, Press Release, Mark Foley Joins HintMD as Chairman of the Board (Nov. 1, 2017). Further, Foley had served as a Managing Director of RWI Ventures, a life sciences and technology venture capital fund, from May 2004 through 2018. *See* Revance, Proxy Statement (Schedule 14A), 8 (filed Mar. 24, 2021).

243. Schilke has more than twenty (20) years of experience in the pharmaceutical and biotechnology industries. In a November 1, 2018 press release announcing Schilke's

appointment as CFO, Revance stated that Schilke had "spent 13 years in senior management roles at Roche and Genentech, leading significant finance and strategic initiatives." Revance, Current Report (Form 8-K) Ex. 99.1 (filed Nov. 1, 2018). Before becoming Revance's Chief Financial Officer in November 2018, Schilke served as the CFO of Achaogen, Inc., a biopharmaceutical company, from July 2016 to October 2018. Revance, Proxy Statement (Schedule 14A), 33 (filed Mar. 24, 2021). Before Achaogen, Schilke was the Finance Director and Company Director of Roche Products Limited, a pharmaceutical company, from August 2014 to June 2016. Revance, Proxy Statement (Schedule 14A), 33 (filed Mar. 24, 2021); LinkedIn, *Tobin Schilke*, https://www.linkedin.com/in/tobin-schilke/. Before Schilke assumed this role at Roche, he was the Director of the Commercial Finance BioOncology Business Unit of Genentech, a biotechnology company involved in the discovery and development of medicines and a member of the Roche Group, from September 2012 to August 2014, and previously was an associate director of commercial finance for Genentech from December 2009 to September 2012. Revance, Proxy Statement (Schedule 14A), 33 (filed Mar. 24, 2021).; Genentech, *About Us*, https://www.gene.com/about-us; https://www.linkedin.com/in/tobin-schilke/. Before working for Roche, Schilke was a process engineer at Pharmacia from August 1998 to August 2001. LinkedIn, *Tobin Schilke*, https://www.linkedin.com/in/tobin-schilke/. Schilke went to Lafayette College, where he earned a B.S. degree, the University of California, Berkeley, where he earned an M.S. Degree, and Cornell University's Johnson Graduate School of Management, where he earned an M.B.A. degree. Revance, Proxy Statement (Schedule 14A), 33 (filed Mar. 24, 2021).

244. Joshi has over 25 years of experience as a pharmaceutical and biotechnology executive. He served as Revance's Chief Operating Officer since December 2015 and as Revance's President, R&D and Product Operations since January 2020. Revance, Proxy Statement (Schedule 14A), 33 (filed Mar. 24, 2021). Before joining Revance, he served as the President and CEO of Alvine Pharmaceuticals, Inc., a pharmaceutical company developing therapeutic products for the treatment of autoimmune and inflammatory diseases, where he was

responsible for overseeing all aspects of the company's business. *Id.* His experience prior to Alvine includes serving as the Vice President of Global Technical Operations, Specialty Pharmaceuticals at Allergan plc, where he was responsible for Allergan's global biologics manufacturing operations for BOTOX®, among other things. *Id.* Joshi currently serves on the board of Genyous Biomed International, Sira Pharmaceuticals, Inc., and Sinopia Biosciences, Inc. He received his BTech in Chemical Engineering from the Indian Institute of Technology, New Delhi, an M.S.E. and a Ph.D. in Chemical Engineering from the University of Michigan, Ann Arbor, and an MBA from the University of California, Irvine. *Id.*

**F. SOX Certifications**

245. Defendants Foley and Schilke signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of Revance's February 26, 2020 10-K annual report for the fiscal year ended December 31, 2019. *See* Revance, Annual Report (Form 10-K), Exs. 32.1 and 32.2 (filed Feb. 26, 2020). The certifications state that the annual report "fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act," and that "[t]he information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *See* Revance, Annual Report (Form 10-K), Exs. 32.1 and 32.2 (filed Feb. 26, 2020). Furthermore, the certifications also state, in relevant part:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

*See id.* at Exs. 31.1 and 31.2.

246. The February 25, 2021 Form 10-K contained substantially similar certifications for the fiscal year ended December 31, 2020. *See* Revance, Annual Report (Form 10-K), Exs.

31.1, 31.2, 32.1, 32.2 (filed Feb. 25, 2021). The August 5, 2021 Form 10-Q contained substantially similar certifications for the quarterly period ended June 30, 2021, signed by Foley and Schilke. *See* Revance, Quarterly Report (Form 10-Q), Exs. 31.1, 31.2, 32.1, and 32.2 (filed Aug. 5, 2021).

## V. PLAINTIFFS' CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Revance securities during the Class Period (the "Class"), and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

248. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Revance securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Revance or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

249. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

250. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

251. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Revance;
- whether the Individual Defendants caused Revance to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Revance securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

252. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

253. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Revance securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentation and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Revance securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

254. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

255. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court *in Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## VI. LOSS CAUSATION

256. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial damages.

257. During the Class Period, Plaintiffs and other Class Members purchased or otherwise acquired Revance securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risk concealed by those undisclosed facts materialized. The price of Revance securities declined significantly, causing Plaintiffs and other Class Members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

258. Defendants made false and misleading statements and material omissions regarding the status of the DAXI BLA, the pre-approval inspection, and the likelihood of approval. On the strength of these false and misleading statements and material omissions, the price of the Company's securities was artificially inflated to a Class Period high of $34.30 per share on September 16, 2020. Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false positive perception of Revance's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Revance securities declined.

259. The true facts and risks regarding the status of the DAXI BLA, the pre-approval inspection, and the likelihood of approval which were omitted and/or misrepresented by Defendants eventually caused the price of Revance's securities to decline on October 12, 2021.

260. Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding the status of the DAXI BLA, the pre-approval inspection, and the likelihood of approval materialized on October 12, 2021, when the Form 483 was revealed to the market. This caused investors to suffer losses as the price of Revance's common stock dropped $6.85 per share, or 25%, to close at $20.45 per share on October 12, 2021.

261. Defendants' statements were further corrected, and the risks concealed by the undisclosed facts regarding the status of the DAXI BLA, the pre-approval inspection, and the likelihood of approval were fully revealed on Friday October 15, 2021, when, after market close, the Company announced the receipt of the CRL from the FDA, denying Revance's BLA. This caused investors to suffer losses as the price of Revance's common stock tumbled, dropping from a close of $22.71 per share on October 15, 2021 to close at $13.81 per share on the next trading day, October 18, 2021, a decline of approximately 39.19%.

262. Accordingly, as a result of their purchases of Revance's publicly traded securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses and damages.

## VII. NO STATUTORY SAFE HARBOR

263. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

264. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

265. Second, many of the identified false and misleading statements were not identified as forward-looking statements.

266. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

267. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleading contained no factual disclosure of any of the specific details concerning the problems with Revance's manufacturing and therein impact on approval of the DAXI BLA, or similar important factors that would give investors adequate notice of such risks. Defendants are liable for those false and misleading forward-looking statements because

at the time each of those statements were made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of Revance who actually knew that each such statement was false or misleading when made.

## VIII. CONTROL PERSON LIABILITY

268. The Individual Defendants, because of their positions with Revance, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each Individual Defendant possessed the power to direct or cause the direction of the management and policies of Revance. Each Individual Defendant had a duty to promptly disseminate complete, accurate, and truthful information with respect to the status of the Company's readiness for the FDA's pre-approval inspection, the status of that inspection, and the impact of those facts on the approval of the DAXI BLA. Each Individual Defendant was provided with copies of the Company's SEC filings and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each Defendant knew or recklessly disregarded that the adverse facts and omission specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## COUNT I
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

269. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

270. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

271. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Revance securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Revance securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

272. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Revance securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Revance's finances and business prospects.

273. By virtue of their positions at Revance, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In

addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

274. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Revance, the Individual Defendants had knowledge of the details of Revance's internal affairs.

275. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Revance. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Revance's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Revance securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Revance's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Revance securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

276. During the Class Period, Revance securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Revance securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs

and the Class, the true value of Revance securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Revance securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

277. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

278. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

279. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

280. During the Class Period, the Individual Defendants participated in the operation and management of Revance, and conducted and participated, directly and indirectly, in the conduct of Revance's business affairs. Because of their senior positions, they knew the adverse non-public information about Revance's misstatements with respect to the status of the DAXI BLA, the Company's readiness for the FDA's pre-approval inspection, the status of that inspection, and the impact of those facts on the approval of the DAXI BLA.

281. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Revance's results of operations, and to correct promptly any public statements issued by Revance which had become materially false or misleading.

282. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Revance disseminated in the marketplace during the Class Period concerning Revance's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Revance to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Revance within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Revance securities.

283. Each of the Individual Defendants, therefore, acted as a controlling person of Revance. By reason of their senior management positions and/or being directors of Revance, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Revance to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Revance and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

284. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Revance.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury on all triable claims.[5]

Dated: November 7, 2022

By: /s/ *James M. Wilson, Jr.*
James M. Wilson, Jr.

James M. Wilson, Jr. (appearance *pro hac vice*)
Robert W. Killorin (appearance *pro hac vice*)
Email: jwilson@faruqilaw.com
Email: rkillorin@faruqilaw.com
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

Danielle L. Manning SBN 313272
E-mail: dmanning@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

*Attorneys for Lead Plaintiff The Tang Family Investor Group and Lead Counsel for the putative Class*

---

[5] Pursuant to § III of the Court's Standing Order for Civil Cases, Plaintiffs submit herewith as Ex. D, a redline document showing the changes made to the previously filed complaint.